UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JAMES GRIFFIN

                      Plaintiff,

    -against-

THE CITY OF NEW YORK,
NEW YORK CITY POLICE DEPARTMENT,
JOSEPH REZNICK, individually,
SEAN CROWLEY, individually,
MICHALE MILTENBERG, individually and
ANTHONY CARDINALE, individually,

                      Defendants.
------------------------------------------------------------------X

10 CIV 1824

**COMPLAINT**

Case No.: _____

**JURY TRIAL DEMANDED**

Judge Pauley

RECEIVED MAR 08 2010

      Plaintiff, JAMES GRIFFIN, by and through his attorneys, The Law Office of BORRELLI & ASSOCIATES, P.L.L.C., complaining of the Defendants, alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters, as follows:

### JURISDICTION AND VENUE

1.     This is a civil action based upon the Defendants' violation of 42 U.S.C. Section 1983 (vis-à-vis violations of The First Amendment Right to Free Speech and the Due Process Clause of the 14th Amendment (substantive and procedural due process denied).

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1343. The supplemental jurisdiction of the Court (28 U.S.C. §1367) is invoked over all state and local law causes of action.

3. Venue is appropriate in this court as all actions comprising the claims for relief occurred within this judicial district and pursuant to 28 U.S.C. § 1391 because one (1) or more of the defendants resides within this judicial district.

## PARTIES

4. At all times hereinafter mentioned, Plaintiff James Griffin ("Griffin" or "Plaintiff"), was and is a resident of the County of Suffolk, State of New York.

5. At all times hereinafter mentioned, Defendant New York City ("City") was and still is a municipal corporation duly organized and existing under the laws of the State of New York.

6. At all times hereinafter mentioned, Defendant the New York City Police Department ("NYPD") was and still is an agent or entity of Defendant City with its principal place of business located at One Police Plaza, New York, NY 10038.

7. At all times relevant hereto, Defendant Joseph Reznick ("Reznick") was the Commanding Officer of the Cold Case Squad of Defendant NYPD

8. At all times relevant hereto, Defendant Sean Crowley ("Crowley") was Captain of The Cold Case Squad of Defendant NYPD, and reported directly to and took orders directly from Defendant Reznick.

9. At all times relevant hereto, Defendant Michael Miltenberg was the Commanding Officer of the 105th Precinct Detective Squad of Defendant NYPD.

10. At all time relevant hereto, Defendant Anthony Cardinale was a Detective of Defendant NYPD, assigned to the Organized Crime Control Bureau, Brooklyn

Narcotics District, as well as an elected official of the Detectives Endowment Association ("DEA"), serving as the Welfare Officer of Brooklyn North.

## BACKGROUND FACTS

11. While acting under color of law and by way of authority and power granted to them by the City, the Defendants, their agents, officers, servants and/or employees, engaged in unlawful conduct by retaliating against Plaintiff for exercising his First Amendment right to free speech and denying him procedural due process by such measures as: (a) creating a hostile work environment; (b) engaging in reckless, intentionally damaging behavior, stigmatizing Plaintiff from his coworkers; (c) denying Plaintiff the right to take and be compensated in cash for overtime while granting that right to other identically-situated employees; (d) denying Plaintiff the right to attend relevant training courses in advancement of his career while granting that right to other identically-situated employees; (e) assigning Plaintiff a disproportionately greater number of assignments and more difficult assignments than any of his coworkers, while also interfering with Plaintiff's work to the extent that it was impossible for Plaintiff to complete his assignments; and (g) eventually constructively discharging Plaintiff's employment at NYPD without providing the process due to Plaintiff under law.

12. The unlawful, harassing and retaliatory behavior on which this action is based commenced in or about December 2005, and was constant, persistent, pervasive and continuing in nature, up until on or around July 25, 2009, the date on which Plaintiff was constructively terminated.

13. Plaintiff is a 48 year-old male.

14. Plaintiff was hired by Defendant NYPD, on or around July 25, 1983, at the entry-level position of "Probationary Police Officer." Through dedication, hard work, and innate skill, in October 2005, Plaintiff was promoted to "Detective First Grade" in the 83rd Precinct Detective Squad, and placed on the "C Team" of detectives.

15. Prior to the events detailed below beginning in or around November 2005, Plaintiff had always received favorable employment evaluations, nothing but praise from his colleagues and supervisors, and numerous citations and awards for his performance.

16. On or around October 22, 2005, Michael O'Keefe ("O'Keefe"), a colleague of Plaintiff's who also held the rank of Detective First Grade, was assigned the responsibility of conducting a witness interview of the victim of a stabbing incident, in which the witness that O'Keefe was required to interview, the victim Marcelo Lopez ("Lopez"), had been stabbed and taken to Elmhurst Hospital.

17. Upon being assigned to interview Lopez, O'Keefe called Elmhurst Hospital in an effort to determine what the best time would be to speak with Lopez. A nurse informed O'Keefe that Lopez had just returned from surgery, was incapacitated, and would not be able to speak to anyone until the following day. Despite Lopez's incapacitation, standard NYPD procedure required O'Keefe to go to Elmhurst anyway, in order to interview the nurses and doctors who had examined and operated on Lopez, search for witnesses, and view cameras.

18. O'Keefe, whose shift was about to end, did not go to the hospital to interview Lopez or the doctors and nurses. Instead, O'Keefe intended to inform one of the 83

       detectives whose shifts would be beginning after O'Keefe's ended that one of them needed to respond to the hospital to interview Lopez after he recovered from surgery.

19. Prior to concluding his shift, O'Keefe forgot to notify any of the detectives on the succeeding shift that one of them needed to interview Lopez and never made any additional attempt himself to interview Lopez. Lopez died shortly thereafter, without anyone from NYPD interviewing him.

20. Subsequent to the aforementioned incident, the NYPD Chief of Detectives, Investigation Unit scheduled a hearing in order to investigate O'Keefe's conduct, and to determine whether or not O'Keefe should be subject to formal discipline for his failure to interview Lopez.

21. Prior to that hearing taking place, on or around November 10, 2005, Plaintiff was riding in a patrol car with Detective Robert Wagner ("Wagner"), when Plaintiff received a call on his personal cell phone from Detective Kevin McCarthy ("McCarthy"). McCarthy was a Detective Third Grade, and was thus inferior in rank to Plaintiff, who was a Detective First Grade. McCarthy had a terrible penchant for speaking derogatively and insultingly about other detectives, and as McCarthy's superior, Plaintiff often reprimanded McCarthy for not being respectful to his colleagues. McCarthy also held an elected position within the Detective Endowment Association ("DEA"), the detectives union of which Plaintiff was a member, and due to McCarthy's negative behavior towards his colleagues, Plaintiff encouraged other detectives to challenge McCarthy for his elected seat. Thus, Plaintiff and McCarthy had a negative history, and the two did not get along.

22. On that November 10, 2005 phone conversation, as a result of the just described negative history between McCarthy and Plaintiff, and despite Plaintiff's superior rank, McCarthy informed Plaintiff that McCarthy wanted Plaintiff, and not O'Keefe, to be disciplined for O'Keefe's failures regarding the October 22, 2005 incident. Thus, McCarthy instructed Plaintiff to contact the Chief of Detectives Investigation Unit and lie to the investigators by accepting blame for the entire incident, by telling the investigators that it was Plaintiff, and not O'Keefe, who had accepted responsibility for the case, and who was thus responsible for failing to conduct the interview of Lopez, as well as the relevant doctors and nurses. When Plaintiff responded that he would not take responsibility for something that was not his fault, McCarthy threatened that if Plaintiff would not lie to the investigators and accept responsibility, then McCarthy, as well as various other detectives, would lie to the investigators by telling them that it was Plaintiff who was responsible.

23. After that conversation was finished, Wagner, who was present in the car with Plaintiff and who had heard Plaintiff's side of the conversation with McCarthy, asked Plaintiff to detail the entire conversation. Plaintiff shared the contents of the entire conversation with Wagner, after which Wagner and Plaintiff conversed about the conversation, with Wagner admitting his disgust with McCarthy's request/threat.

24. At that moment, Plaintiff was so disgusted by McCarthy's willingness to interfere with an NYPD investigation by lying that, as a citizen concerned about a public matter, he decided to bring McCarthy's conduct to the investigating unit's attention, despite the fact that he had no obligation to do so.

25. However, on or around November 16, 2005, after no one from the Chief of Detectives, Investigation Unit, had contacted Plaintiff regarding O'Keefe's investigation, Plaintiff, who still wanted McCarthy's conduct brought to light, acting as a concerned citizen on a matter of public concern, exercised his 1st Amendment rights by contacting the NYPD Internal Affairs Bureau to report the fact that McCarthy had instructed Plaintiff to lie during an official investigation, and had then threatened that he and unknown others would lie to the investigators themselves if Plaintiff failed to do so.

26. On or around December 7, 2005, Plaintiff was approached by Detective Joyce Mariner, who advised that all of Plaintiff's colleagues in the 83rd Precinct were discussing the rumor that someone had reported McCarthy to Internal Affairs. Plaintiff immediately responded to Mariner that it was true, and that it was Plaintiff who had contacted Internal Affairs because he was outraged by McCarthy's conduct.

27. On or around December 8, 2005, Wagner called Plaintiff. Wagner informed Plaintiff that over the past 24 hours, Wagner had received calls from police officers all over inquiring as to whether Plaintiff had contacted Internal Affairs regarding McCarthy. Plaintiff informed Wagner that he had contacted Internal Affairs. Wagner replied that although McCarthy's conduct had been wrong, Plaintiff was wrong to contact Internal Affairs, and that Wagner could not "defend [Plaintiff] in any way now."

28. From December 8, 2005, and lasting until Plaintiff's constructive termination almost four (4) years later, as explained thoroughly by, but not limited to, the events detailed and described in the succeeding paragraphs of this Complaint, the Defendants

continuously, thoroughly, severely, and repeatedly retaliated against Plaintiff for Plaintiff having exercised his constitutionally protected right of free speech.

29. On or around December 9, 2005, Plaintiff arrived at work to find the word "RAT" written largely across Plaintiff's locker in permanent magic marker.

30. On or around that same date, December 9, 2005, Plaintiff entered the precinct dormitory to find the mattress that he was known to frequently use, otherwise known as "his mattress," flipped over and vandalized.

31. On or around that same date, December 9, 2005, Detective Rosario Rizzo, while angrily pacing back and forth in the office in front of many of Plaintiff's colleagues at the 83rd Precinct, stated several times to Plaintiff that he could not believe that Plaintiff was a rat. Rizzo also repeatedly called Plaintiff a coward, and then quickly approached Plaintiff in an aggressive manner as if he were about to physically assault Plaintiff. Plaintiff's colleagues were forced to quickly intervene by pulling Rizzo away from Plaintiff, at which point Rizzo stated that he would "clock [Plaintiff's] whistle." One of the unit's supervisors, Sergeant Steven Sauer, witnessed the entire incident, however he did nothing to subdue Rizzo or remove Rizzo from Plaintiff's vicinity after Rizzo had attempted to assault Plaintiff. Rizzo then threatened that he was going to write that "[Plaintiff] is a rat" on every chalkboard in the building.

32. The next day, on or around December 10, 2005, none of Plaintiff's colleagues at the 83rd Precinct would either speak to Plaintiff or make eye contact with him, and all of them made it patently obvious that they were ignoring Plaintiff. Additionally, in conjunction with all of Plaintiff's colleagues ignoring him, one of Plaintiff's colleagues with whom Plaintiff had frequently worked, David Milani ("Milani"),

8

refused to leave the office with him in order to conduct investigations for active cases on which Plaintiff had been assigned, and on which Milani's cooperation was needed. Pursuant to NYPD procedure, all investigations must be conducted with at least two (2) detectives. Plaintiff informed his supervisor, Lieutenant John Tenant ("Tenant"), about Milani's refusal to conduct investigations with him, in the hopes that Tenant would remedy the situation by either assigning another detective to work with Plaintiff, or by ordering Milani to work with Plaintiff. Tenant, however, did nothing to fix the situation. Thus, as a result of Milani's refusal to conduct investigations with Plaintiff and as a result of Tenant's refusal to remedy that problem, Plaintiff was prevented from conducting investigations, an extremely essential function of his job.

33. On or around that same date, December 10, 2005, Milani dissuaded Plaintiff from attending the 83rd Precinct office Christmas Party. Plaintiff had already purchased a ticket to this event, so Milani refunded Plaintiff's money.

34. On or around December 24, 2005, Plaintiff's mother passed away. In breaking with tradition at the 83rd Precinct, none of Plaintiff's colleagues sent flowers to the wake, and very few of them bothered to attend. In fact, Defendant Cardinale informed Plaintiff that he did not personally attend the wake solely due to Plaintiff having called Internal Affairs.

35. Throughout the month of December 2005, Internal Affairs conducted its investigation into Plaintiff's allegations against McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful. For example, when asked to corroborate Plaintiff's aforementioned conversation with McCarthy that occurred on October 22, 2005 while Wagner was in the car sitting right next to Plaintiff, and

the details of which Plaintiff and Wagner had discussed immediately after Plaintiff got off the phone with McCarthy, Wagner told the investigators that he "did not recall any specific statements made by [Plaintiff] and did not hear any statements made by Detective McCarthy." Moreover, McCarthy himself lied to the investigators by stating that the reason he had called Plaintiff was to "confer with [Plaintiff] about the case" and that he never instructed Plaintiff to lie. McCarthy's assertion, however, is belied by the fact that Plaintiff and McCarthy had never worked on that case together and thus had no reason to "confer" about it. As a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated.

36. On or around January 7, 2006, two (2) days before Plaintiff was scheduled to return from his annual vacation that had also been extended by four (4) days of bereavement leave, Plaintiff received notice from one of his supervisors, Lieutenant Tenant, that upon his return to work, Plaintiff would be transferred from the "C Team" to the "E Team." Tenant explained to Plaintiff that the C Team detectives held a lot of animosity towards Plaintiff, and that in the department's opinion, the best solution to prevent further problems was to uplift Plaintiff and place him on a different team.

37. Upon Plaintiff's return to work on or around January 9, 2006, Plaintiff observed that the word "RAT," which Plaintiff had discovered written largely across his locker an entire month prior, on December 9, 2005, had not been removed. None of Plaintiff's supervisors found the presence of that word on Plaintiff's locker to be inappropriate, as none of them made any effort to have the word removed in the entire month since it had first been written. Moreover, Plaintiff, discovered that the word "RAT" had also been written across Plaintiff's locker in multiple additional places.

38. On or around January 10, 2006, Plaintiff again noticed that none of the other detectives would either speak to Plaintiff or make eye contact with him. Given that it was necessary for Plaintiff to communicate with his colleagues in order to conduct investigations, the fact that none of Plaintiff's colleagues would even speak to him made it impossible for Plaintiff to conduct investigations and thus satisfactorily do his job. Plaintiff informed Tenant of this fact, but Tenant did not offer any solution.

39. On or around January 16, 2006, Detective Joseph Tallarine ("Tallarine") began his first day of work on the C Team at the 83rd Precinct. Upon seeing Plaintiff for the first time, Tallarine stated to Plaintiff that although he had heard the story detailed above, he "was not here for anything that went on," and would not have a problem working with Plaintiff in the future. After becoming aware of Tallarine's willingness to work with Plaintiff, Tenant moved Plaintiff back to the C Team, and assigned Plaintiff and Tallarine to work together. Later that same date, Tallarine told Plaintiff that Tallarine had noticed many of the other C Team members giving Tallarine "dirty looks" for communicating with Plaintiff and for agreeing to work with him.

40. On or about January 17, 2006, Plaintiff witnessed and overheard a conversation between Tallarine and Detective Anthony Cardinale ("Cardinale"), who was a Board Member of the DEA. In this conversation, Plaintiff overheard Cardinale say to Tallarine that "we want [Plaintiff] to leave, he's a rat." Additionally, Cardinale told Tallarine that "we don't want you to talk to him, work with him, nothing." Cardinale does not work in the same building as the detectives of the 83rd precinct, so it was obvious to Plaintiff that Cardinale had come to the 83rd Precinct for the sole purpose of having this conversation with Tallarine.

41. Subsequent to the conversation described in the previous paragraph, Plaintiff approached Cardinale in an effort to explain to Cardinale Plaintiff's version of the events leading up to Plaintiff reporting McCarthy to Internal Affairs. McCarthy, just like Cardinale, was also Board Member of the DEA, so Plaintiff thought that Cardinale would be interested in his colleague's disgraceful conduct. Cardinale responded by stating that everyone at DEA thought of Plaintiff as a rat, that no one in the entire NYPD was currently talking to Plaintiff or would ever talk to him again in the future, that no one could stand to be in the same room as Plaintiff, and that everyone wanted Plaintiff to just resign from his position with NYPD. Moreover, Cardinale stated that these events would forever affect Plaintiff's family. Lastly, Cardinale advised Plaintiff not to attend the upcoming Detectives Endowment Association Convention, an event which Plaintiff had attended every year with his wife and three (3) children.

42. After Cardinale's conversation with Tallarine, up until on or around March 2, 2006, Tallarine and Plaintiff continued to work together. However, as a result of Cardinale's lecture, Tallarine's attitude towards Plaintiff became hostile, and the two generally did not communicate unless it was absolutely necessary.

43. On or around March 2, 2006, Plaintiff was transferred to the Cold Case Squad, and placed under the command of Defendant Deputy Chief Joseph Reznick. Upon information and belief, Plaintiff's former colleagues from the 83rd Precinct made several phone calls to Plaintiff's new unit prior to Plaintiff's arrival there, in which they informed Plaintiff's new colleagues that Plaintiff was a "rat," and advised Plaintiff's new colleagues not to work with Plaintiff. For this reason, none of