Plaintiff's new colleagues, except for Detective Mark Valencia ("Valencia"), would agree to work with Plaintiff upon his arrival at Cold Case Squad. Furthermore, upon information and belief, Defendant Reznick, Plaintiff's new direct supervisor, was also the recipient of one of these calls, and thus had full knowledge of Plaintiff having filed the report against McCarthy with Internal Affairs. As a result, as detailed below, Reznick further retaliated against Plaintiff by exacerbating an already hostile situation.

44. Immediately upon Plaintiff's arrival at his new unit, Reznick assigned Plaintiff a significantly greater number of cases than any other member of that unit.

45. On or around March 12, 2007, Plaintiff asked Reznick for permission to attend a 3 day training course at the Henry C. Lee Institute of Forensic Science on Cold Case Investigations. The training course would have been at no cost to NYPD and was directly relevant to Plaintiff's responsibilities at his new unit. Reznick denied Plaintiff's request without explanation.

46. On around April 10, 2007, Plaintiff again asked for permission to attend a relevant training program, this time an FBI-run program on profiling. The course would have been at no cost to NYPD. However, Reznick once again denied Plaintiff's request, and instead chose to send two other detectives and one sergeant to the training course.

47. On or around April 18, 2007, Valencia declared his refusal to work with Plaintiff because Plaintiff was a "rat." Valencia also left a note on Plaintiff's desk in which Valencia called Plaintiff a "rat." As a result, Reznick teamed Plaintiff with Detective Stephen Berger ("Berger"), who worked in a precinct in the Bronx. This meant that either Plaintiff or Berger would have to commute from the Queens precinct to the

Bronx precinct, or vice-versa, in order for the two to work together. This greatly complicated Plaintiff's ability to complete the essential functions of his job.

48. On or around May 2, 2007, at a meeting of the Cold Case Squad, presided over by Defendant Captain Sean Crowley, and at which all Cold Case Squad members were present, Crowley stated that Reznick had ordered Crowley not to authorize any cash overtime for Plaintiff for the month of May 2007. Crowley further stated that Reznick had ordered Crowley to "shut [Plaintiff] down," and that Reznick's command was highly unusual. Crowley then instructed Plaintiff to "put Crowley in [this] law suit," meaning that Crowley was fully aware that the actions being taken against Plaintiff were illegal.

49. On July 11, 2007, Plaintiff filed a grievance with the DEA concerning Reznick's retaliatory actions in refusing to allow Plaintiff to work overtime and be compensated in cash, while at the same time allowing all other similarly-situated members of Plaintiff's unit to work overtime and be compensated in cash. The grievance contained numerous examples of times that Reznick, as carried out by Crowley, singled out Plaintiff treating him disparately from his similarly-situated colleagues.

50. One such example occurred in or around early 2007 while Plaintiff was still partnered with Valencia. At that time, Plaintiff and Valencia were instructed to drive to Farmingdale, New York to exhume a body from a Long Island cemetery. As Plaintiff and Valencia's normal shift was ending, and the two had not completed their task at the cemetery Valencia called Reznick to request permission to work overtime. Reznick approved Valencia's request, but then told Valencia to tell Plaintiff that he

was not approving overtime for Plaintiff, and Plaintiff should return to the command post immediately, to clock out prior to being due overtime.

51. Another such example occurred on May 3, 2007, when Plaintiff's partner, Detective Berger, called Crowley, in Plaintiff's presence, and asked to be compensated in cash for overtime that he had worked. Crowley granted Berger's request. At that time, Plaintiff asked Berger to make the exact same request for Plaintiff pertaining to the exact same overtime worked, yet Crowley denied Plaintiff's request to be compensated in cash, instead only approving Plaintiff to be compensated in time.

52. Another such example occurred on May 31, 2007, when Crowley approved the request of Detective Oscar Hernandez to be compensated in cash, yet denied Plaintiff's exact same request by only approving compensation in time.

53. Another such example occurred in or around July 2007, when Sergeant H. Scott Hamilton refused to approve Plaintiff's request for reimbursement for expenditures made by Plaintiff during an investigation, and stated that Reznick had ordered Hamilton not to grant Plaintiff's request.

54. On or around September 17, 2007, after conducting a review of Plaintiff's active caseload, Crowley stated to Plaintiff that whomever had assigned this particular batch of cases to Plaintiff did not want him to succeed in making arrests as the cases were all practically unsolvable and designed to waste Plaintiff's time. Crowley's implication was that Reznick, who had assigned Plaintiff this caseload immediately after Plaintiff had transferred to the Cold Case Squad, had intentionally retaliated against Plaintiff by assigning him the most difficult cases possible, as opposed to solvable cases which he assigned to Plaintiff's similarly-situated colleagues.

55. On or around October 11, 2007, Plaintiff submitted a transfer request to Reznick, in which Plaintiff officially requested a transfer to the 105th Precinct Detective Squad.

56. On or around October 26, 2007, rather than transfer Plaintiff to the 105th Squad, as Plaintiff had initially requested, Reznick instead transferred Plaintiff to the 111th Precinct Detective Squad.

57. Upon reporting for duty at the 111th Squad, Plaintiff informed his new supervisor that Plaintiff had requested a transfer to the 105th Squad, and that the 105th Squad remained Plaintiff's preferred location. Lieutenant Donna Divagno ("Divagno") of the 111th Squad then contacted the 105th Squad, determined that there was an opening and a need for a detective possessing Plaintiff's credentials at the 105th Squad, and informed Plaintiff that she would "get the ball rolling" in completing Plaintiff's transfer to the 105th Squad. However, prior to "getting the ball rolling," Divagno discovered that Reznick had submitted an inter-office memorandum to the Chief of Detectives, George Brown, in which Reznick ordered that Plaintiff not be granted his request for a transfer to the 105th Squad. Upon information and belief, Reznick had no connection to either the 105th or 111th Squads, and thus the unit to which Plaintiff was transferred should not have mattered to Reznick.

58. On or around November 27, 2007, Plaintiff filed a grievance with the DEA in which he detailed the information in the previous three (3) paragraphs.

59. In or around March 2008, Plaintiff received in his office mailbox a report filed by a member of the 83rd Precinct regarding a robbery that had some alleged connection to the 111th Precinct. Plaintiff's name was listed in the body of the report, along with several derogatory remarks about, and threats towards Plaintiff. Over the next several

weeks, Plaintiff received several more of these "complaints," all mentioning Plaintiff by name, all containing relatively similar degrading and threatening content, and all written in unidentifiable block letters. Plaintiff filed a grievance pertaining to these "reports" with the DEA on March 26, 2008.

60. Shortly thereafter, Plaintiff was transferred to the 105th Precinct Detective Squad.

61. In or around January 2009, Plaintiff arrived at work at the 105th Precinct to find the word "RAT" written on the hole puncher that normally sits on Plaintiff's desk.

62. In or around May 2009, Plaintiff discovered that his locker at the 105th Precinct had been vandalized, and that pictures had been deleted from Plaintiff's personal camera. Plaintiff issued the camera to Internal Affairs so that they might test it for DNA evidence and/or fingerprints in order to identify who had vandalized Plaintiff's locker, but Internal Affairs was unable to determine the culprit's identity.

63. In or around May 2009, Plaintiff's new supervisor at the 105th Squad, Lieutenant Michael Miltenberg ("Miltenberg"), after approving, with great delay, Plaintiff's request to work one (1) week of his vacation time, a very standard request that is approved for other detectives as a matter of course, intentionally failed to submit the official paperwork approving the vacation time to Timekeeping.

64. Subsequently, on or around July 9, 2009, while on leave, Plaintiff was called by the Queens County District Attorney's Office to help review facts from an investigation that Plaintiff had conducted. In keeping with standard procedure, prior to working overtime hours, Plaintiff called Detective Borough Queens to request permission to work the overtime and had his request approved. After working the overtime hours,

Plaintiff submitted his request for cash overtime compensation; however, Miltenberg made calls to ensure that Plaintiff's request was pulled and thus not approved.

65. On July 14, 2009, Plaintiff filed a grievance with the DEA regarding the incidents described in the previous two paragraphs.

66. In or around July 2009, Miltenberg, at a staff meeting, stared directly at Plaintiff and stated that "there's a rat in here, not someone who retired or transferred but sitting right here in this room." As a direct result of Miltenberg's actions, all of Plaintiff's colleagues refused to work and/or speak to Plaintiff.

67. On or about July 25, 2009, the accumulation of events described in the preceding paragraphs resulted in Plaintiff being constructively terminated from his employment at NYPD.

## CLAIMS FOR RELIEF

### AND AS FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

*Violation of 42 U.S.C. § 1983*
*First Amendment Right to Free Speech*

68. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

69. The aforementioned acts of Defendants in creating a hostile work environment, stigmatizing Plaintiff from his coworkers, denying Plaintiff the right to overtime benefits while granting it to other identically-situated employees, denying Plaintiff the right to attend relevant training courses in advancement of his career while granting the right to other identically-situated employees, assigning Plaintiff a

disproportionately greater number of and more difficult assignments than any of his coworkers, yet also interfering with Plaintiff's work to the extent that it was impossible for Plaintiff to complete his assignments, and eventually constructively discharging Plaintiff's employment at NYPD, and other acts of retaliation described above, are a violation of Plaintiff's rights under the First Amendment of the United States Constitution, and 42 U.S.C. § 1983.

70. Plaintiff's reporting of McCarthy to the NYPD Internal Affairs Bureau is speech protected under the First Amendment as speech by a concerned citizen on a matter of public concern, as Plaintiff was a concerned citizen at all relevant times mentioned herein, and as an NYPD Detective counseling another NYPD Detective to lie to investigators, and then threatening to lie to investigators himself, is undoubtedly a matter of public concern.

71. Acting under color of law, in retaliation for Plaintiff's engagement in the aforementioned protected activity, Defendant Reznick intentionally took the various adverse employment actions against Plaintiff described above, including thus influencing Defendant Crowley to take adverse employment actions against Plaintiff.

72. Acting under color of law, in retaliation for Plaintiff's engagement in the aforementioned protected activity, Defendants Crowley, Miltenberg, and Cardinale intentionally took the various adverse employment actions against Plaintiff described above.

73. Acting under color of law, Defendants NYPD and City knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendants Reznick, Crowley, Miltenberg, and Cardinale in their duties to

refrain from unlawfully and maliciously retaliating against Plaintiff for engaging in constitutionally protected activities.

74. As a result of the concerted, unlawful and malicious conspiracy of all Defendants, who were acting under color of law, Plaintiff was subjected to various adverse employment actions as described above in retaliation for his engagement in protected activities.

75. As a result of Defendants' aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

## AND AS FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

*Violation of 42 U.S.C. § 1983*
*Fifth and Fourteenth Amendment Due Process Rights*

76. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

77. Defendants, by and through its employees did, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subject, or cause to be subjected, Plaintiff to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, and shall be liable to Plaintiff.

78. As a result of Defendants' acts, Plaintiff was deprived his fundamental liberty and property rights without due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.

79. Defendants acted with malice or with reckless indifference toward the Plaintiff's federally protected rights by harassing and retaliating against Plaintiff after he exercised said rights.

80. Acting under color of law, Defendants NYPD and City knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendants Reznick, Crowley, Miltenber, and Cardinale in their duties to refrain from unlawfully and maliciously retaliating against Plaintiff for engaging in protected activities.

81. Defendants Reznick, Crowley, Miltenberg, and Cardinale violated Plaintiff's Constitutional rights by denying him substantive due process by engaging in reckless, intentionally damaging behavior, stigmatizing him, creating a hostile work environment, denying Plaintiff career advancement and training opportunities, overtime pay, and vacation leave, and constructively terminating Plaintiff from his position of employment with NYPD.

82. Defendants violated Plaintiff's Constitutional rights by denying him procedural due process by engaging in reckless, intentionally damaging behavior and stigmatizing him and/or providing bias process and forcing his termination.

83. As a result of Defendants aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

**AND AS FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDATS**

*Violation of 42 U.S.C. § 1985*

84. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

85. The aforementioned acts of retaliation described fully above are a violation of Plaintiff's rights under the First Amendment and 42 U.S.C. § 1985.

86. Defendants, by and through their employees, acting under color of law as agents of the City did conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

87. Plaintiff's speech regarding matters of public concern is protected under the First Amendment as speech by a public employee on matters of public concern.

88. Acting under color of law, Defendants conspired to continually harass Plaintiff as described fully above in retaliation for Plaintiff's engagement in the aforementioned protected activity, and took adverse employment actions, as described fully above, against Plaintiff.

89. As a result of Defendants aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

## AND AS FOR A FOURTH CAUSE OF ACTION

## AGAINST DEFENDANTS REZNICK, CROWLEY, MILTENBERG, and CARDINALE

*Intentional Infliction of Emotional Distress*

90. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

91. Defendants Reznick, Crowley, Miltenberg, and Cardinale, by their actions described herein, exhibited extreme and outrageous conduct towards Plaintiff.

92. In undertaking the aforementioned actions, Defendants intended to cause Plaintiff severe emotional distress.

93. The aforementioned conduct of Defendants has caused Plaintiff severe emotional distress and mental anguish.

94. As a proximate cause of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer damages.

## DEMAND FOR A JURY TRIAL

95. Plaintiff demands a trial by jury of all issues and claims in this action.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1. Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

2. A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned laws protected by the United States Constitution as well as New York State.

3. Reinstatement and/or advancement for Plaintiff who have lost positions as a result of the Defendants illegal conduct;

4. Granting an order restraining Defendants from any retaliation against any Plaintiff for participation in any form in this litigation;

5. All damages which Plaintiff has sustained as a result of Defendants' conduct, including back pay, front pay, general and special damages for lost compensation and job benefits they would have received but for Defendants' conduct, and for emotional distress, humiliation, embarrassment, foreclosure of liberty and anguish;

6. Front pay to Plaintiff until such time as he can be placed in the same position he would now have occupied but for Defendants' discriminatory practices;

7. Exemplary and punitive damages in an amount commensurate with Defendants' ability and so as to deter future malicious, reckless and/or intentional conduct;

8. Awarding Plaintiff costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

9. Pre-judgment and post-judgment interest, as provided by law; and

10. Granting Plaintiff other and further relief as this Court finds necessary and proper.

Dated: Carle Place, New York
March 5, 2010

Respectfully submitted,

Borrelli & Associates, P.L.L.C.
Attorneys for Plaintiff
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 248-5550 (Phone)

MICHAEL J. BORRELLI (MB-8533)