UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JAMES GRIFFIN

                            Plaintiff,

            -against-

THE CITY OF NEW YORK,
NEW YORK CITY POLICE DEPARTMENT,
JOSEPH REZNICK, individually,
SEAN CROWLEY, individually,
MICHALE MILTENBERG, individually and
ANTHONY CARDINALE, individually,

                           Defendants.
------------------------------------------------------------------X

**AMENDED COMPLAINT**

**Case No.: 10-CV-01824**

**JURY TRIAL DEMANDED**

       Plaintiff, JAMES GRIFFIN, by and through his attorneys, The Law Office of BORRELLI & ASSOCIATES, P.L.L.C., complaining of the Defendants, alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1.    This is a civil action based upon the Defendants' violation of 42 U.S.C. Sections 1983 & 1985 (vis-à-vis violations of The First Amendment Right to Free Speech and the Due Process Clause of the 14th Amendment (substantive and procedural due process denied)); New York Civil Service Law Section 75(b); and intentional infliction of emotional distress.

2.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1343.  The supplemental jurisdiction of the Court (28 U.S.C. §1367) is invoked over all state and local law causes of action.

3.      Venue is appropriate in this court as all actions comprising the claims for relief occurred within this judicial district and pursuant to 28 U.S.C. § 1391 because one (1) or more of the defendants resides within this judicial district.

## PARTIES

4.      At all times hereinafter mentioned, Plaintiff James Griffin ("Griffin" or "Plaintiff"), was and is a resident of the County of Suffolk, State of New York.

5.      At all times hereinafter mentioned, Defendant New York City ("City") was and still is a municipal corporation duly organized and existing under the laws of the State of New York.

6.      At all times hereinafter mentioned, Defendant the New York City Police Department ("NYPD") was and still is an agent or entity of Defendant City with its principal place of business located at One Police Plaza, New York, NY 10038.

7.      At all times relevant hereto, Defendant Joseph Reznick ("Reznick") was the Commanding Officer of the Cold Case Squad of Defendant NYPD

8.      At all times relevant hereto, Defendant Sean Crowley ("Crowley") was Captain of The Cold Case Squad of Defendant NYPD, and reported directly to and took orders directly from Defendant Reznick.

9.      At all times relevant hereto, Defendant Michael Miltenberg was the Commanding Officer of the 105th Precinct Detective Squad of Defendant NYPD.

10.     At all time relevant hereto, Defendant Anthony Cardinale was a Detective of Defendant NYPD, assigned to the Organized Crime Control Bureau, Brooklyn Narcotics District, as well as an elected official of the Detectives Endowment Association ("DEA"), serving as the Welfare Officer of Brooklyn North.

## BACKGROUND FACTS

11.    While acting under color of law and by way of authority and power granted to them by the City, the Defendants, their agents, officers, servants and/or employees, engaged in unlawful conduct by retaliating against Plaintiff for exercising his First Amendment right to free speech and denying him procedural due process by such measures as: (a) creating a hostile work environment; (b) engaging in reckless, intentionally damaging behavior, stigmatizing Plaintiff from his coworkers; (c) denying Plaintiff the right to take and be compensated in cash for overtime while granting that right to other identically-situated employees; (d) denying Plaintiff the right to attend relevant training courses in advancement of his career while granting that right to other identically-situated employees; (e) assigning Plaintiff a disproportionately greater number of assignments and more difficult assignments than any of his coworkers, while also interfering with Plaintiff's work to the extent that it was impossible for Plaintiff to complete his assignments; and (g) eventually constructively discharging Plaintiff's employment at NYPD without providing the process due to Plaintiff under law.

12.    The unlawful, harassing and retaliatory behavior on which this action is based commenced in or about December 2005, and was constant, persistent, pervasive and continuing in nature, up until on or around July 25, 2009, the date on which Plaintiff was constructively terminated.

13.    Plaintiff is a 48 year-old male.

14.    Plaintiff was hired by Defendant NYPD, on or around July 25, 1983, at the entry-level position of "Probationary Police Officer."  Through dedication, hard work, and

innate skill, in October 2005, Plaintiff was promoted to "Detective First Grade" in the 83rd Precinct Detective Squad, and placed on the "C Team" of detectives.

15. Prior to the events detailed below beginning in or around November 2005, Plaintiff had always received favorable employment evaluations, nothing but praise from his colleagues and supervisors, and numerous citations and awards for his performance.

16. On or around October 22, 2005, Michael O'Keefe ("O'Keefe"), a colleague of Plaintiff's who also held the rank of Detective First Grade, was assigned the responsibility of conducting a witness interview of the victim of a stabbing incident, in which the witness that O'Keefe was required to interview, the victim Marcelo Lopez ("Lopez"), had been stabbed and taken to Elmhurst Hospital.

17. Upon being assigned to interview Lopez, O'Keefe called Elmhurst Hospital in an effort to determine what the best time would be to speak with Lopez. A nurse informed O'Keefe that Lopez had just returned from surgery, was incapacitated, and would not be able to speak to anyone until the following day. Despite Lopez's incapacitation, standard NYPD procedure required O'Keefe to go to Elmhurst anyway, in order to interview the nurses and doctors who had examined and operated on Lopez, search for witnesses, and view cameras.

18. O'Keefe, whose shift was about to end, did not go to the hospital to interview Lopez or the doctors and nurses. Instead, O'Keefe intended to inform one of the 83 detectives whose shifts would be beginning after O'Keefe's ended that one of them needed to respond to the hospital to interview Lopez after he recovered from surgery.

19. Prior to concluding his shift, O'Keefe forgot to notify any of the detectives on the succeeding shift that one of them needed to interview Lopez and never made any

additional attempt himself to interview Lopez.  Lopez died shortly thereafter, without anyone from NYPD interviewing him.

20.    Subsequent to the aforementioned incident, the NYPD Chief of Detectives, Investigation Unit scheduled a hearing in order to investigate O'Keefe's conduct, and to determine whether or not O'Keefe should be subject to formal discipline for his failure to interview Lopez.

21.    Prior to that hearing taking place, on or around November 10, 2005, Plaintiff was riding in a patrol car with Detective Robert Wagner ("Wagner"), when Plaintiff received a call on his personal cell phone from Detective Kevin McCarthy ("McCarthy").  McCarthy was a Detective Third Grade, and was thus inferior in rank to Plaintiff, who was a Detective First Grade.  McCarthy had a terrible penchant for speaking derogatively and insultingly about other detectives, and as McCarthy's superior, Plaintiff often reprimanded McCarthy for not being respectful to his colleagues.  McCarthy also held an elected position within the Detective Endowment Association ("DEA"), the detectives union of which Plaintiff was a member, and due to McCarthy's negative behavior towards his colleagues, Plaintiff encouraged other detectives to challenge McCarthy for his elected seat.  Thus, Plaintiff and McCarthy had a negative history, and the two did not get along.

22.    On that November 10, 2005 phone conversation, as a result of the just described negative history between McCarthy and Plaintiff, and despite Plaintiff's superior rank, McCarthy informed Plaintiff that McCarthy wanted Plaintiff, and not O'Keefe, to be disciplined for O'Keefe's failures regarding the October 22, 2005 incident.  Thus, McCarthy instructed Plaintiff to contact the Chief of Detectives Investigation

Unit and lie to the investigators by accepting blame for the entire incident, by telling the investigators that it was Plaintiff, and not O'Keefe, who had accepted responsibility for the case, and who was thus responsible for failing to conduct the interview of Lopez, as well as the relevant doctors and nurses. When Plaintiff responded that he would not take responsibility for something that was not his fault, McCarthy threatened that if Plaintiff would not lie to the investigators and accept responsibility, then McCarthy, as well as various other detectives, would lie to the investigators by telling them that it was Plaintiff who was responsible.

23. After that conversation was finished, Wagner, who was present in the car with Plaintiff and who had heard Plaintiff's side of the conversation with McCarthy, asked Plaintiff to detail the entire conversation. Plaintiff shared the contents of the entire conversation with Wagner, after which Wagner and Plaintiff conversed about the conversation, with Wagner admitting his disgust with McCarthy's request/threat.

24. At that moment, Plaintiff was so disgusted by McCarthy's willingness to interfere with an NYPD investigation by lying that, as a citizen concerned about a public matter, he decided to bring McCarthy's conduct to the investigating unit's attention, despite the fact that he had no obligation to do so.

25. However, on or around November 16, 2005, after no one from the Chief of Detectives, Investigation Unit, had contacted Plaintiff regarding O'Keefe's investigation, Plaintiff, who still wanted McCarthy's conduct brought to light, acting as a concerned citizen on a matter of public concern, exercised his 1st Amendment rights by contacting the NYPD Internal Affairs Bureau to report the fact that McCarthy had instructed Plaintiff to lie during an official investigation, and had then

threatened that he and unknown others would lie to the investigators themselves if Plaintiff failed to do so.

26. On or around December 7, 2005, Plaintiff was approached by Detective Joyce Mariner, who advised that all of Plaintiff's colleagues in the 83rd Precinct were discussing the rumor that someone had reported McCarthy to Internal Affairs. Plaintiff immediately responded to Mariner that it was true, and that it was Plaintiff who had contacted Internal Affairs because he was outraged by McCarthy's conduct.

27. On or around December 8, 2005, Wagner called Plaintiff.  Wagner informed Plaintiff that over the past 24 hours, Wagner had received calls from police officers all over inquiring as to whether Plaintiff had contacted Internal Affairs regarding McCarthy. Plaintiff informed Wagner that he had contacted Internal Affairs.  Wagner replied that although McCarthy's conduct had been wrong, Plaintiff was wrong to contact Internal Affairs, and that Wagner could not "defend [Plaintiff] in any way now."

28. From December 8, 2005, and lasting until Plaintiff's constructive termination almost four (4) years later, as explained thoroughly by, but not limited to, the events detailed and described in the succeeding paragraphs of this Complaint, the Defendants continuously, thoroughly, severely, and repeatedly retaliated against Plaintiff for Plaintiff having exercised his constitutionally protected right of free speech.

29. On or around December 9, 2005, Plaintiff arrived at work to find the word "RAT" written largely across Plaintiff's locker in permanent magic marker.

30. On or around that same date, December 9, 2005, Plaintiff entered the precinct dormitory to find the mattress that he was known to frequently use, otherwise known as "his mattress," flipped over and vandalized.

31.    On or around that same date, December 9, 2005, Detective Rosario Rizzo, while angrily pacing back and forth in the office in front of many of Plaintiff's colleagues at the 83rd Precinct, stated several times to Plaintiff that he could not believe that Plaintiff was a rat.  Rizzo also repeatedly called Plaintiff a coward, and then quickly approached Plaintiff in an aggressive manner as if he were about to physically assault Plaintiff.  Plaintiff's colleagues were forced to quickly intervene by pulling Rizzo away from Plaintiff, at which point Rizzo stated that he would "clock [Plaintiff's] whistle."  One of the unit's supervisors, Sergeant Steven Sauer, witnessed the entire incident, however he did nothing to subdue Rizzo or remove Rizzo from Plaintiff's vicinity after Rizzo had attempted to assault Plaintiff.  Rizzo then threatened that he was going to write that "[Plaintiff] is a rat" on every chalkboard in the building.

32.    The next day, on or around December 10, 2005, none of Plaintiff's colleagues at the 83rd Precinct would either speak to Plaintiff or make eye contact with him, and all of them made it patently obvious that they were ignoring Plaintiff.  Additionally, in conjunction with all of Plaintiff's colleagues ignoring him, one of Plaintiff's colleagues with whom Plaintiff had frequently worked, David Milani ("Milani"), refused to leave the office with him in order to conduct investigations for active cases on which Plaintiff had been assigned, and on which Milani's cooperation was needed.  Pursuant to NYPD procedure, all investigations must be conducted with at least two (2) detectives.  Plaintiff informed his supervisor, Lieutenant John Tenant ("Tenant"), about Milani's refusal to conduct investigations with him, in the hopes that Tenant would remedy the situation by either assigning another detective to work with Plaintiff, or by ordering Milani to work with Plaintiff.  Tenant, however, did nothing

to fix the situation.  Thus, as a result of Milani's refusal to conduct investigations with Plaintiff and as a result of Tenant's refusal to remedy that problem, Plaintiff was prevented from conducting investigations, an extremely essential function of his job.

33.    On or around that same date, December 10, 2005, Milani dissuaded Plaintiff from attending the 83rd Precinct office Christmas Party.  Plaintiff had already purchased a ticket to this event, so Milani refunded Plaintiff's money.

34.    On or around December 24, 2005, Plaintiff's mother passed away.  In breaking with tradition at the 83rd Precinct, none of Plaintiff's colleagues sent flowers to the wake, and very few of them bothered to attend.  In fact, Defendant Cardinale informed Plaintiff that he did not personally attend the wake solely due to Plaintiff having called Internal Affairs.

35.    Throughout the month of December 2005, Internal Affairs conducted its investigation into Plaintiff's allegations against McCarthy.  All of the material witnesses failed to cooperate with the investigation by being less than truthful.  For example, when asked to corroborate Plaintiff's aforementioned conversation with McCarthy that occurred on October 22, 2005 while Wagner was in the car sitting right next to Plaintiff, and the details of which Plaintiff and Wagner had discussed immediately after Plaintiff got off the phone with McCarthy, Wagner told the investigators that he "did not recall any specific statements made by [Plaintiff] and did not hear any statements made by Detective McCarthy."  Moreover, McCarthy himself lied to the investigators by stating that the reason he had called Plaintiff was to "confer with [Plaintiff] about the case" and that he never instructed Plaintiff to lie.  McCarthy's assertion, however, is belied by the fact that Plaintiff and McCarthy had never worked on that case together

and thus had no reason to "confer" about it.  As a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated.

36.     On or around January 7, 2006, two (2) days before Plaintiff was scheduled to return from his annual vacation that had also been extended by four (4) days of bereavement leave, Plaintiff received notice from one of his supervisors, Lieutenant Tenant, that upon his return to work, Plaintiff would be transferred from the "C Team" to the "E Team."   Tenant explained to Plaintiff that the C Team detectives held a lot of animosity towards Plaintiff, and that in the department's opinion, the best solution to prevent further problems was to uplift Plaintiff and place him on a different team.

37.     Upon Plaintiff's return to work on or around January 9, 2006, Plaintiff observed that the word "RAT," which Plaintiff had discovered written largely across his locker an entire month prior, on December 9, 2005, had not been removed.  None of Plaintiff's supervisors found the presence of that word on Plaintiff's locker to be inappropriate, as none of them made any effort to have the word removed in the entire month since it had first been written.  Moreover, Plaintiff, discovered that the word "RAT" had also been written across Plaintiff's locker in multiple additional places.

38.     On or around January 10, 2006, Plaintiff again noticed that none of the other detectives would either speak to Plaintiff or make eye contact with him.  Given that it was necessary for Plaintiff to communicate with his colleagues in order to conduct investigations, the fact that none of Plaintiff's colleagues would even speak to him made it impossible for Plaintiff to conduct investigations and thus satisfactorily do his job.  Plaintiff informed Tenant of this fact, but Tenant did not offer any solution.

39.     On or around January 16, 2006, Detective Joseph Tallarine ("Tallarine") began his first day of work on the C Team at the 83rd Precinct.  Upon seeing Plaintiff for the first time, Tallarine stated to Plaintiff that although he had heard the story detailed above, he "was not here for anything that went on," and would not have a problem working with Plaintiff in the future.  After becoming aware of Tallarine's willingness to work with Plaintiff, Tenant moved Plaintiff back to the C Team, and assigned Plaintiff and Tallarine to work together.  Later that same date, Tallarine told Plaintiff that Tallarine had noticed many of the other C Team members giving Tallarine "dirty looks" for communicating with Plaintiff and for agreeing to work with him.

40.     On or about January 17, 2006, Plaintiff witnessed and overheard a conversation between Tallarine and Detective Anthony Cardinale ("Cardinale"), who was a Board Member of the DEA.  In this conversation, Plaintiff overheard Cardinale say to Tallarine that "we want [Plaintiff] to leave, he's a rat."  Additionally, Cardinale told Tallarine that "we don't want you to talk to him, work with him, nothing."  Cardinale does not work in the same building as the detectives of the 83rd precinct, so it was obvious to Plaintiff that Cardinale had come to the 83rd Precinct for the sole purpose of having this conversation with Tallarine.

41.     Subsequent to the conversation described in the previous paragraph, Plaintiff approached Cardinale in an effort to explain to Cardinale Plaintiff's version of the events leading up to Plaintiff reporting McCarthy to Internal Affairs.  McCarthy, just like Cardinale, was also Board Member of the DEA, so Plaintiff thought that Cardinale would be interested in his colleague's disgraceful conduct.  Cardinale responded by stating that everyone at DEA thought of Plaintiff as a rat, that no one in

the entire NYPD was currently talking to Plaintiff or would ever talk to him again in the future, that no one could stand to be in the same room as Plaintiff, and that everyone wanted Plaintiff to just resign from his position with NYPD. Moreover, Cardinale stated that these events would forever affect Plaintiff's family. Lastly, Cardinale advised Plaintiff not to attend the upcoming Detectives Endowment Association Convention, an event which Plaintiff had attended every year with his wife and three (3) children.

42.   After Cardinale's conversation with Tallarine, up until on or around March 2, 2006, Tallarine and Plaintiff continued to work together. However, as a result of Cardinale's lecture, Tallarine's attitude towards Plaintiff became hostile, and the two generally did not communicate unless it was absolutely necessary.

43.   On or around March 2, 2006, Plaintiff was transferred to the Cold Case Squad, and placed under the command of Defendant Deputy Chief Joseph Reznick. Upon information and belief, Plaintiff's former colleagues from the 83rd Precinct made several phone calls to Plaintiff's new unit prior to Plaintiff's arrival there, in which they informed Plaintiff's new colleagues that Plaintiff was a "rat," and advised Plaintiff's new colleagues not to work with Plaintiff. For this reason, none of Plaintiff's new colleagues, except for Detective Mark Valencia ("Valencia"), would agree to work with Plaintiff upon his arrival at Cold Case Squad. Furthermore, upon information and belief, Defendant Reznick, Plaintiff's new direct supervisor, was also the recipient of one of these calls, and thus had full knowledge of Plaintiff having filed the report against McCarthy with Internal Affairs. As a result, as detailed

below, Reznick further retaliated against Plaintiff by exacerbating an already hostile situation.

44.    Immediately upon Plaintiff's arrival at his new unit, Reznick assigned Plaintiff a significantly greater number of cases than any other member of that unit.

45.    On or around March 12, 2007, Plaintiff asked Reznick for permission to attend a 3 day training course at the Henry C. Lee Institute of Forensic Science on Cold Case Investigations.    The training course would have been at no cost to NYPD and was directly relevant to Plaintiff's responsibilities at his new unit.    Reznick denied Plaintiff's request without explanation.

46.    On around April 10, 2007, Plaintiff again asked for permission to attend a relevant training program, this time an FBI-run program on profiling.    The course would have been at no cost to NYPD.    However, Reznick once again denied Plaintiff's request, and instead chose to send two other detectives and one sergeant to the training course.

47.    On or around April 18, 2007, Valencia declared his refusal to work with Plaintiff because Plaintiff was a "rat."    Valencia also left a note on Plaintiff's desk in which Valencia called Plaintiff a "rat."    As a result, Reznick teamed Plaintiff with Detective Stephen Berger ("Berger"), who worked in a precinct in the Bronx.    This meant that either Plaintiff or Berger would have to commute from the Queens precinct to the Bronx precinct, or vice-versa, in order for the two to work together.    This greatly complicated Plaintiff's ability to complete the essential functions of his job.

48.    On or around May 2, 2007, at a meeting of the Cold Case Squad, presided over by Defendant Captain Sean Crowley, and at which all Cold Case Squad members were present, Crowley stated that Reznick had ordered Crowley not to authorize any cash

overtime for Plaintiff for the month of May 2007. Crowley further stated that Reznick had ordered Crowley to "shut [Plaintiff] down," and that Reznick's command was highly unusual. Crowley then instructed Plaintiff to "put Crowley in [this] law suit," meaning that Crowley was fully aware that the actions being taken against Plaintiff were illegal.

49. On July 11, 2007, Plaintiff filed a grievance with the DEA concerning Reznick's retaliatory actions in refusing to allow Plaintiff to work overtime and be compensated in cash, while at the same time allowing all other similarly-situated members of Plaintiff's unit to work overtime and be compensated in cash. The grievance contained numerous examples of times that Reznick, as carried out by Crowley, singled out Plaintiff treating him disparately from his similarly-situated colleagues.

50. One such example occurred in or around early 2007 while Plaintiff was still partnered with Valencia. At that time, Plaintiff and Valencia were instructed to drive to Farmingdale, New York to exhume a body from a Long Island cemetery. As Plaintiff and Valencia's normal shift was ending, and the two had not completed their task at the cemetery Valencia called Reznick to request permission to work overtime. Reznick approved Valencia's request, but then told Valencia to tell Plaintiff that he was not approving overtime for Plaintiff, and Plaintiff should return to the command post immediately, to clock out prior to being due overtime.

51. Another such example occurred on May 3, 2007, when Plaintiff's partner, Detective Berger, called Crowley, in Plaintiff's presence, and asked to be compensated in cash for overtime that he had worked. Crowley granted Berger's request. At that time, Plaintiff asked Berger to make the exact same request for Plaintiff pertaining to the

exact same overtime worked, yet Crowley denied Plaintiff's request to be compensated in cash, instead only approving Plaintiff to be compensated in time.

52.    Another such example occurred on May 31, 2007, when Crowley approved the request of Detective Oscar Hernandez to be compensated in cash, yet denied Plaintiff's exact same request by only approving compensation in time.

53.    Another such example occurred in or around July 2007, when Sergeant H. Scott Hamilton refused to approve Plaintiff's request for reimbursement for expenditures made by Plaintiff during an investigation, and stated that Reznick had ordered Hamilton not to grant Plaintiff's request.

54.    On or around September 17, 2007, after conducting a review of Plaintiff's active caseload, Crowley stated to Plaintiff that whomever had assigned this particular batch of cases to Plaintiff did not want him to succeed in making arrests as the cases were all practically unsolvable and designed to waste Plaintiff's time. Crowley's implication was that Reznick, who had assigned Plaintiff this caseload immediately after Plaintiff had transferred to the Cold Case Squad, had intentionally retaliated against Plaintiff by assigning him the most difficult cases possible, as opposed to solvable cases which he assigned to Plaintiff's similarly-situated colleagues.

55.    On or around October 11, 2007, Plaintiff submitted a transfer request to Reznick, in which Plaintiff officially requested a transfer to the 105th Precinct Detective Squad.

56.    On or around October 26, 2007, rather than transfer Plaintiff to the 105th Squad, as Plaintiff had initially requested, Reznick instead transferred Plaintiff to the 111th Precinct Detective Squad.

57.   Upon reporting for duty at the 111th Squad, Plaintiff informed his new supervisor that Plaintiff had requested a transfer to the 105th Squad, and that the 105th Squad remained Plaintiff's preferred location.  Lieutenant Donna Divagno ("Divagno") of the 111th Squad then contacted the 105th Squad, determined that there was an opening and a need for a detective possessing Plaintiff's credentials at the 105th Squad, and informed Plaintiff that she would "get the ball rolling" in completing Plaintiff's transfer to the 105th Squad.  However, prior to "getting the ball rolling," Divagno discovered that Reznick had submitted an inter-office memorandum to the Chief of Detectives, George Brown, in which Reznick ordered that Plaintiff not be granted his request for a transfer to the 105th Squad.  Upon information and belief, Reznick had no connection to either the 105th or 111th Squads, and thus the unit to which Plaintiff was transferred should not have mattered to Reznick.

58.   On or around November 27, 2007, Plaintiff filed a grievance with the DEA in which he detailed the information in the previous three (3) paragraphs.

59.   In or around March 2008, Plaintiff received in his office mailbox a report filed by a member of the 83rd Precinct regarding a robbery that had some alleged connection to the 111th Precinct.  Plaintiff's name was listed in the body of the report, along with several derogatory remarks about, and threats towards Plaintiff.  Over the next several weeks, Plaintiff received several more of these "complaints," all mentioning Plaintiff by name, all containing relatively similar degrading and threatening content, and all written in unidentifiable block letters.  Plaintiff filed a grievance pertaining to these "reports" with the DEA on March 26, 2008.

60.   Shortly thereafter, Plaintiff was transferred to the 105th Precinct Detective Squad.

61.    In or around January 2009, Plaintiff arrived at work at the 105th Precinct to find the word "RAT" written on the hole puncher that normally sits on Plaintiff's desk.

62.    In or around May 2009, Plaintiff discovered that his locker at the 105th Precinct had been vandalized, and that pictures had been deleted from Plaintiff's personal camera. Plaintiff issued the camera to Internal Affairs so that they might test it for DNA evidence and/or fingerprints in order to identify who had vandalized Plaintiff's locker, but Internal Affairs was unable to determine the culprit's identity.

63.    In or around May 2009, Plaintiff's new supervisor at the 105th Squad, Lieutenant Michael Miltenberg ("Miltenberg"), after approving, with great delay, Plaintiff's request to work one (1) week of his vacation time, a very standard request that is approved for other detectives as a matter of course, intentionally failed to submit the official paperwork approving the vacation time to Timekeeping.

64.    Subsequently, on or around July 9, 2009, while on leave, Plaintiff was called by the Queens County District Attorney's Office to help review facts from an investigation that Plaintiff had conducted.  In keeping with standard procedure, prior to working overtime hours, Plaintiff called Detective Borough Queens to request permission to work the overtime and had his request approved.  After working the overtime hours, Plaintiff submitted his request for cash overtime compensation; however, Miltenberg made calls to ensure that Plaintiff's request was pulled and thus not approved.

65.    On July 14, 2009, Plaintiff filed a grievance with the DEA regarding the incidents described in the previous two paragraphs.

66.    In or around July 2009, Miltenberg, at a staff meeting, stared directly at Plaintiff and stated that "there's a rat in here, not someone who retired or transferred but sitting

right here in this room." As a direct result of Miltenberg's actions, all of Plaintiff's colleagues refused to work and/or speak to Plaintiff.

67.     On or about July 25, 2009, the accumulation of events described in the preceding paragraphs resulted in Plaintiff being constructively terminated from his employment at NYPD.

## CLAIMS FOR RELIEF

## AND AS FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

*Violation of 42 U.S.C. § 1983*
*First Amendment Right to Free Speech*

68.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

69.     The aforementioned acts of Defendants in creating a hostile work environment, stigmatizing Plaintiff from his coworkers, denying Plaintiff the right to overtime benefits while granting it to other identically-situated employees, denying Plaintiff the right to attend relevant training courses in advancement of his career while granting the right to other identically-situated employees, assigning Plaintiff a disproportionately greater number of and more difficult assignments than any of his coworkers, yet also interfering with Plaintiff's work to the extent that it was impossible for Plaintiff to complete his assignments, and eventually constructively discharging Plaintiff's employment at NYPD, and other acts of retaliation described above, are a violation of Plaintiff's rights under the First Amendment of the United States Constitution, and 42 U.S.C. § 1983.

70.     Plaintiff's reporting of McCarthy to the NYPD Internal Affairs Bureau is speech protected under the First Amendment as speech by a concerned citizen on a matter of public concern, as Plaintiff was a concerned citizen at all relevant times mentioned herein, and as an NYPD Detective counseling another NYPD Detective to lie to investigators, and then threatening to lie to investigators himself, is undoubtedly a matter of public concern.

71.     Acting under color of law, in retaliation for Plaintiff's engagement in the aforementioned protected activity, Defendant Reznick intentionally took the various adverse employment actions against Plaintiff described above, including thus influencing Defendant Crowley to take adverse employment actions against Plaintiff.

72.     Acting under color of law, in retaliation for Plaintiff's engagement in the aforementioned protected activity, Defendants Crowley, Miltenberg, and Cardinale intentionally took the various adverse employment actions against Plaintiff described above.

73.     Acting under color of law, Defendants NYPD and City knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendants Reznick, Crowley, Miltenberg, and Cardinale in their duties to refrain from unlawfully and maliciously retaliating against Plaintiff for engaging in constitutionally protected activities.

74.     As a result of the concerted, unlawful and malicious conspiracy of all Defendants, who were acting under color of law, Plaintiff was subjected to various adverse employment actions as described above in retaliation for his engagement in protected activities.

75.     As a result of Defendants' aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

**AND AS FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**

*Violation of 42 U.S.C. § 1983*
*Fifth and Fourteenth Amendment Due Process Rights*

76.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

77.     Defendants, by and through its employees did, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subject, or cause to be subjected, Plaintiff to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, and shall be liable to Plaintiff.

78.     As a result of Defendants' acts, Plaintiff was deprived his fundamental liberty and property rights without due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.

79.     Defendants acted with malice or with reckless indifference toward the Plaintiff's federally protected rights by harassing and retaliating against Plaintiff after he exercised said rights.

80.     Acting under color of law, Defendants NYPD and City knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendants Reznick, Crowley, Miltenber, and Cardinale in their duties to refrain from unlawfully and maliciously retaliating against Plaintiff for engaging in protected activities.

81.  Defendants Reznick, Crowley, Miltenberg, and Cardinale violated Plaintiff's Constitutional rights by denying him substantive due process by engaging in reckless, intentionally damaging behavior, stigmatizing him, creating a hostile work environment, denying Plaintiff career advancement and training opportunities, overtime pay, and vacation leave, and constructively terminating Plaintiff from his position of employment with NYPD.

82.  Defendants violated Plaintiff's Constitutional rights by denying him procedural due process by engaging in reckless, intentionally damaging behavior and stigmatizing him and/or providing bias process and forcing his termination.

83.  As a result of Defendants aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

### AND AS FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDATS

#### *Violation of 42 U.S.C. § 1985*

84.  Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

85.  The aforementioned acts of retaliation described fully above are a violation of Plaintiff's rights under the First Amendment and 42 U.S.C. § 1985.

86.  Defendants, by and through their employees, acting under color of law as agents of the City did conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his

property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

87.    Plaintiff's speech regarding matters of public concern is protected under the First Amendment as speech by a public employee on matters of public concern.

88.    Acting under color of law, Defendants conspired to continually harass Plaintiff as described fully above in retaliation for Plaintiff's engagement in the aforementioned protected activity, and took adverse employment actions, as described fully above, against Plaintiff.

89.    As a result of Defendants aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

**AND AS FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

*Violation of NY Civil Service Law § 75(b)*

90.    Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

91.    Defendants did take disciplinary and/or other adverse personnel action against Plaintiff, a public employee.

92.    Plaintiff did disclose to a governmental body information regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety.

93.    Plaintiff did disclose to a governmental body information the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

94.   Defendants did dismiss or take other disciplinary or other adverse personnel action against Plainitff, a public employee, regarding his employment, because of these disclosures.

95.   Prior to disclosing this information, Plaintiff did make a good faith effort to provide the appointing authority or his or her designee the information to be disclosed and provided the appointing authority or designee a reasonable time to take appropriate action.

96.   As a result of Defendants' aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish, public ridicule, public stigmatization and emotional distress.

## AND AS FOR A FIFTH CAUSE OF ACTION

## AGAINST DEFENDANTS REZNICK, CROWLEY, MILTENBERG, and CARDINALE

### *Intentional Infliction of Emotional Distress*

97.   Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

98.   Defendants Reznick, Crowley, Miltenberg, and Cardinale, by their actions described herein, exhibited extreme and outrageous conduct towards Plaintiff.

99.   In undertaking the aforementioned actions, Defendants intended to cause Plaintiff severe emotional distress.

100.  The aforementioned conduct of Defendants has caused Plaintiff severe emotional distress and mental anguish.

101.  As a proximate cause of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer damages.

## **DEMAND FOR A JURY TRIAL**

102.    Plaintiff demands a trial by jury of all issues and claims in this action.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1.    Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

2.    A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned laws protected by the United States Constitution as well as New York State .

3.    Reinstatement and/or advancement for  Plaintiff who have lost positions as a result of the Defendants illegal conduct;

4.    Granting an order restraining Defendants from any retaliation against any Plaintiff for participation in any form in this litigation;

5.    All damages which Plaintiff has sustained as a result of Defendants' conduct, including back pay, front pay, general and special damages for lost compensation and job benefits they would have received but for Defendants' conduct, and for emotional distress, humiliation, embarrassment, foreclosure of liberty and anguish;

6.    Front pay to Plaintiff until such time as he can be placed in the same position he would now have occupied but for Defendants' discriminatory practices;

7.    Exemplary and punitive damages in an amount commensurate with Defendants' ability and so as to deter future malicious, reckless and/or intentional conduct;

8.   Awarding Plaintiff costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

9.   Pre-judgment and post-judgment interest, as provided by law; and

10.   Granting Plaintiff other and further relief as this Court finds necessary and proper.

Dated: Carle Place, New York
        March 31, 2010

                                        Respectfully submitted,

                                        Borrelli & Associates, P.L.L.C.
                                        Attorneys for Plaintiff
                                        One Old Country Road, Suite 347
                                        Carle Place, New York 11514
                                        (516) 248-5550 (Phone)

                                        _____/s/_____
                                        MICHAEL J. BORRELLI (MB-8533)