UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
JAMES GRIFFIN,

                Plaintiff,

          – against –

THE CITY OF NEW YORK, NEW YORK
CITY POLICE DEPARTMENT, JOSEPH
REZNICK, individually, SEAN CROWLEY,
individually, and MICHAEL MILTENBERG,
individually,

                Defendants.
-------------------------------------------------------- x

**MEMORANDUM OF DECISION**

10 CV 2592 (RJD) (MDG)

DEARIE, District Judge.

# I. INTRODUCTION

       Plaintiff, a 26-year veteran of the New York City Police Department ("NYPD") and former Detective First Grade within the 83rd Precinct Detective Squad, alleges that his supervisors and co-workers forced his resignation after he complained to the NYPD's Internal Affairs Bureau ("IAB") that a fellow detective had attempted to pressure him to falsely accept blame for a botched homicide investigation. Suing under 42 U.S.C. § 1983 ("Section 1983"), plaintiff claims that the retaliation he faced as a result of reporting his colleague's misconduct violated his right to free speech as guaranteed by the First Amendment and his rights to procedural and substantive due process under the Fifth and Fourteenth Amendments. Additionally, plaintiff alleges that defendants conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985 ("Section 1985") and asserts claims for intentional infliction of emotional distress and "whistleblower" retaliation under New York State law.

       Defendants move to dismiss plaintiff's Amended Complaint ("Compl." or "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). In an Order dated March 30, 2012, the

Court held that, unless and until the evidence shows otherwise, plaintiff may prosecute his Section 1983 claim for First Amendment retaliation against the City of New York and the individually named defendants because plaintiff's complaint to IAB plainly qualifies as protected speech. The Court, however, granted defendants' motion with respect to plaintiff's due process, Section 1985, and state law claims. This Memorandum explains the Court's decision.

## II. BACKGROUND

The pertinent allegations follow.  Plaintiff, now 50 years old, joined the NYPD as an entry-level officer in 1983.  In October 2005, he was promoted to Detective First Grade and placed on the C Team of detectives in the 83rd Precinct in Bushwick, Brooklyn.  Prior to the events giving rise to plaintiff's claims, plaintiff had received "nothing but praise from his colleagues and supervisors, and numerous citations and awards for his performance."  Compl. ¶ 15.

A.  Underlying Basis for Retaliation

The harms allegedly suffered by plaintiff arise from a botched murder investigation.  On October 22, 2005, Detective First Grade Michael O'Keefe ("O'Keefe") was assigned to interview a stabbing victim being treated at Elmhurst Hospital.  Via telephone, a nurse informed O'Keefe that the victim was incapacitated post-surgery and would be unable to speak with anyone until the next day.  Standard NYPD operating procedures required O'Keefe to visit the hospital to interview the treating and operating physicians and nurses, as well as search for witnesses and other evidence.  O'Keefe, whose shift was ending, did not do so, did not instruct anyone else to do so, and made no further attempt to interview the victim, who died "shortly thereafter." Subsequently, the NYPD's Investigation Unit ("IU") scheduled a hearing to decide whether to formally discipline O'Keefe.  Compl. ¶¶ 16-19.

On November 10, 2005, while plaintiff was patrolling with colleague Detective Robert Wagner ("Wagner"), Detective Third Grade Kevin McCarthy ("McCarthy") called to ask plaintiff to contact IU and accept blame for O'Keefe's mistake. McCarthy added that if plaintiff refused, McCarthy and other detectives would falsely inform IU that the failed investigation was plaintiff's fault. Compl. ¶¶ 21-22. McCarthy and plaintiff "had never worked on that case together and thus had no reason to 'confer' about it." Compl. ¶ 35. Because plaintiff had previously reprimanded McCarthy for being disrespectful to colleagues and had encouraged others to challenge McCarthy for his elected union position at the Detective Endowment Association ("the union"), plaintiff and McCarthy had a "negative history." Compl. ¶ 21. Plaintiff shared the contents of the entire conversation with Wagner who "admit[ed] his disgust with McCarthy's request/threat." Compl. ¶ 23.

Plaintiff decided to bring McCarthy's threats to IU's attention. When no one from IU reached out to him, on November 16, 2005, plaintiff "exercised his First Amendment rights by contacting . . . [IAB] to report the fact that McCarthy had instructed plaintiff to lie during an official investigation." Compl. ¶ 25.

On December 7, 2005, plaintiff was advised by a fellow detective that all of plaintiff's colleagues in the 83rd Precinct were discussing a rumor that McCarthy was the subject of an IAB report. Plaintiff responded that the rumor was true and that it was he who had contacted IAB. Compl. ¶ 26. The following day, December 8, 2005, Wagner called plaintiff and castigated him for reporting McCarthy to IAB. Although McCarthy's "conduct had been wrong," Wagner said, "plaintiff was wrong to contact [IAB], and . . . Wagner could not 'defend [plaintiff] in any way now.'" Compl. ¶ 27.

The alleged retaliation began shortly after word got out that it was plaintiff who had reported McCarthy's corrupt overtures to IAB and continued until plaintiff's constructive termination from the NYPD on July 25, 2009. Compl. ¶¶ 28, 67.

B. Retaliation

1. 83rd Precinct: December 2005—March 2006

On December 9, 2005, plaintiff found the word "RAT" written in permanent marker in large letters on his locker, and the mattress he was known to use in the precinct dormitory was "flipped over and vandalized." Compl. ¶¶ 29-30. Later that day, while pacing in front of many of plaintiff's colleagues, including one of the unit's supervisors, a fellow detective repeatedly called plaintiff a "rat" and a "coward," and then approached plaintiff in an aggressive manner. After being pulled away by colleagues, the detective stated that he would "clock [plaintiff's] whistle" and "write that '[plaintiff] is a rat' on every chalkboard in the building." Compl. ¶ 31.

The following day, December 10, 2005, none of plaintiff's colleagues would speak or make eye contact with plaintiff, including the officer with whom plaintiff had frequently worked and was assigned on that day to conduct investigations. Although plaintiff informed his supervisor that his partner was unwilling to work with him and asked whether another detective could be assigned, plaintiff's supervisor "did nothing to fix the situation." Because "all investigations must be conducted with at least two . . . detectives . . . plaintiff was prevented from conducting investigations" on that day. Additionally, plaintiff's partner "dissuaded" plaintiff from attending the Precinct's Christmas party and refused to "refund Plaintiff's money" for tickets already bought. When plaintiff's mother passed away two weeks later, none of plaintiff's colleagues sent flowers—as was tradition—and few attended the wake. One detective

explicitly told plaintiff that he did not attend "solely due to plaintiff having called internal affairs." Compl. ¶¶ 32-34.

Throughout December 2005, IAB investigated plaintiff's allegations against McCarthy; however, "[a]ll of the material witnesses failed to cooperate with the investigation," including Wagner who told the investigators that he "did not hear any statements made by . . . McCarthy," and McCarthy himself, who stated that he had only "called plaintiff . . . 'to confer with [him] about the case' and that he never instructed plaintiff to lie." The IAB dismissed the allegations made by plaintiff against McCarthy as "unsubstantiated." Compl. ¶ 35.

In early January, after plaintiff's return to the office following vacation, plaintiff was informed by one of his supervisors that he would be transferred from the C Team to the E Team because the "C Team detectives held a lot of animosity towards plaintiff, and that in the department's opinion . . . [the transfer was] the best solution to prevent further problems . . . ." Compl. ¶ 36. Plaintiff noticed that the word "RAT" had not yet been removed from his locker and since had been written in multiple other places on plaintiff's locker. Compl. ¶ 37. As before his vacation, "none of the other detectives would either speak to plaintiff or make eye contact with him," which "made it impossible for plaintiff to conduct investigations and thus satisfactorily do his job." Although plaintiff again complained to his superior, the superior "did not offer any solution." Compl. ¶ 38.

On January 16, 2006, Detective Joseph Tallarine ("Tallarine") began working on the C Team and told plaintiff that although he had heard of the IAB report, he "would not have a problem working with plaintiff in the future." Based on Tallarine's willingness to work with plaintiff, plaintiff's supervisor moved him back to the C Team. The partnership, however, did not last long. Later that same day, Tallarine told plaintiff that he had noticed other C Team members

giving Tallarine "dirty looks," ostensibly for agreeing to work with plaintiff. Compl. ¶ 39. The following day, plaintiff "witnessed and overheard" a conversation between Tallarine and Detective Anthony Cardinale ("Cardinale"), a union board member, during which Cardinale told Tallarine that "we want [plaintiff] to leave, he's a rat," and "we don't want you to talk to him, work with him, nothing." Plaintiff then approached Cardinale "in an effort to explain to Cardinale plaintiff's version of the events." Cardinale responded that "everyone at [the union] thought of plaintiff as a rat, that no one in the entire NYPD was currently talking to plaintiff or would ever talk to him again in the future . . . that everyone wanted plaintiff to just resign from his position with NYPD . . . [and] that these events would forever affect plaintiff's family." Compl. ¶¶ 40-41. Although Tallarine and plaintiff continued to work together, "Tallarine's attitude towards plaintiff became hostile and the two generally did not communicate unless it was absolutely necessary." Compl. ¶ 42.

2. Cold Case Squad: March 2006—October 2007

On March 2, 2006, plaintiff was transferred to the Cold Case Squad and placed under the command of defendant, Deputy Chief Joseph Reznick ("Reznick"). Prior to plaintiff's arrival, his former colleagues from the 83rd Precinct allegedly contacted his new unit, including Reznick, to inform them of the IAB complaint and that plaintiff was a rat and to encourage them not to work with him. The advanced warning worked, as "none of plaintiff's new colleagues," except for Detective Mark Valencia ("Valencia"), would agree to work with plaintiff. Compl. ¶ 43. Within about a year, however, Valencia had "declared his refusal to work with plaintiff because plaintiff was a 'rat'" and left a note on plaintiff's desk telling him so. After Valencia rejected plaintiff, Reznick reassigned plaintiff to work with another detective, but from a different precinct located far away in the Bronx, which "greatly complicated plaintiff's ability to complete the essential

functions of his job," as one or both detectives had to commute long distances to work together. Compl. ¶ 47.

From the beginning of plaintiff's time on the Cold Case Squad until his transfer around October 2007, Reznick engaged in a string of allegedly retaliatory actions, including (1) assigning plaintiff a "significantly greater number of cases" than others, Compl. ¶ 44, all of which plaintiff would later be told by a different supervisor were "practically unsolvable and designed to waste plaintiff's time," Compl. ¶ 54; (2) denying plaintiff's request to attend two relevant training courses while sending other detectives to one of those courses "without explanation," Compl. ¶¶ 45-46; (3) denying, or ordering others to deny, on at least four occasions, plaintiff the ability to work overtime and be compensated in cash, although this was customary and provided to plaintiff's partners on the exact same assignments, Compl. ¶¶ 48, 50-52; (4) denying, or ordering others to deny, plaintiff's request for reimbursement of expenditures made during an investigation, Compl. ¶ 53; and (5) blocking plaintiff's request to transfer to the 105th Precinct by "submit[ing] an inter-office memorandum to the Chief of Detectives . . . order[ing] that plaintiff not be granted his request." Compl. ¶ 57. Reznick instead transferred him to the 111th Precinct, although "there was an opening and a need for a detective possessing plaintiff's credentials" at the 105th Precinct. Compl. ¶¶ 55-57.

Among the individuals allegedly instructed by Reznick to deny plaintiff cash overtime pay or otherwise treat plaintiff differently from his peers, was defendant Captain Sean Crowley ("Crowley"). On May 2, 2007, during a meeting presided over by Crowley at which all Cold Case Squad members were present, Crowley stated that Reznick had ordered him "not to authorize any cash overtime" for plaintiff for May 2007, informed plaintiff and the others that "Reznick had ordered Crowley to 'shut [plaintiff] down,'" and dared plaintiff to put "Crowley in

[this] law suit." Compl. ¶ 48. Crowley also denied plaintiff's request for overtime while granting it to his partners for the same work on the same assignments on at least two other occasions. Compl. ¶¶ 51-52.

Plaintiff filed a grievance with the union citing "numerous examples of times that Reznick, as carried out by Crowley, singled out plaintiff treating him disparately from his similarly-situated colleagues." Compl. ¶ 49. In addition, plaintiff filed a grievance with the union based upon Reznick's efforts to deny him a transfer to the 105th Precinct. Compl. ¶¶ 55-58.

3. 111th and 105th Precincts: October 2007—July 2009

Around March 2008, while plaintiff was working at the 111th Precinct, he received by mail a report regarding a robbery that had "some alleged connection to the 111th Precinct" filed by an anonymous member of the 83rd Precinct, plaintiff's original Precinct, which included "several derogatory remarks about, and threats toward plaintiff." Over the ensuing weeks, plaintiff received "several more" such missives, "all mentioning plaintiff by name [and] . . . all containing relatively similar degrading and threatening content." Plaintiff filed a grievance with the union based upon these incidents. Compl. ¶ 59.

Shortly thereafter, plaintiff was finally transferred to the 105th Precinct as he had originally requested, where he fared no better. Although no incidents are alleged between March and December 2008, in January 2009, the word "RAT" was written on plaintiff's hole puncher and in May 2009, plaintiff's locker was vandalized and pictures were deleted from his personal camera. Although plaintiff turned over the camera to IAB in an attempt to identify the culprit, they were unable to do so. Compl. ¶¶ 60-62.

Plaintiff's supervisor at the 105th Precinct, defendant Lieutenant Michael Miltenberg ("Miltenberg"), also allegedly engaged in retaliatory conduct. In May 2009, Miltenberg

"intentionally failed to submit" official paperwork approving plaintiff's "very standard request . . . approved for other detectives as a matter of course" to work one week of his vacation. Compl. ¶ 63. On or around July 9, 2009, after plaintiff worked approved overtime hours on a different matter, Miltenberg "made calls to ensure that plaintiff's request [for cash overtime compensation] was pulled and thus not approved." Compl. ¶ 64. Plaintiff filed a grievance with the union regarding Miltenberg's actions. Compl. ¶ 65. Lastly, at a staff meeting held shortly before plaintiff's constructive termination, Miltenberg "stared directly at plaintiff and stated that 'there's a rat in here, not someone who retired or transferred but sitting right here in this room.'" Plaintiff alleges that "[a]s a direct result of Miltenberg's actions, all of plaintiff's colleagues refused to work and/or speak to plaintiff." Compl. ¶ 66.

Soon after this meeting, on July 25, 2009, plaintiff decided he had had enough and left the NYPD. Compl. ¶ 67.

C.  Instant Matter

Plaintiff initially filed his complaint in the Southern District of New York on March 8, 2010, ECF Docket # 1, and then amended his complaint on April 29, 2010, ECF Docket # 3. On June 1, 2010, on consent of all of the parties, the case was transferred to the Eastern District of New York. ECF Docket # 11. On October 28, 2010, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), plaintiff voluntarily dismissed his claims without prejudice and without costs as against one named defendant, Anthony Cardinale. ECF Docket # 25. On November 22, 2010, the remaining defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF Docket # 29; plaintiff responded on December 28, 2010, ECF Docket # 34, and defendants replied on January 19, 2011, ECF Docket # 32. Oral argument was held on the

motion on June 23, 2011, ECF Docket # 38, and I subsequently allowed both parties to file supplemental briefings.

## III. DISCUSSION

A.  Standard of Review

Under Rule 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding such a motion, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (citations and internal quotation marks omitted). The Court should dismiss a claim only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim[] which would entitle [him] to relief." Id. (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)) (internal quotation marks omitted).

A complaint must nevertheless plead a "plausible" claim for relief to survive a motion to dismiss under Rule 12(b)(6). Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Accepting all non-conclusory factual allegations as true, a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678-79. Where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

B. Section 1983 Claims

    1. Background Principles and Parties

Plaintiff sues the City of New York, the NYPD, and the individual defendants pursuant to Section 1983 for violations of his right to free speech under the First Amendment and rights to procedural and substantive due process under the Fifth and Fourteenth Amendments. As an initial matter, all claims brought solely against the NYPD must be dismissed with prejudice, as "the NYPD is a non-suable agency of the City." Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (citing N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law.")). Defendants rightfully do not dispute the fact that the City of New York and the individual defendants are proper parties.

    2. First Amendment Retaliation Claim

Plaintiff's claim for First Amendment retaliation is the pivotal issue in this case. It is by now well settled that "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140 (1983). Accordingly, subject to restrictions that are "necessary for their employers to operate efficiently and effectively," government employers cannot take adverse action against an employee for engaging in protected speech. Garcetti v. Ceballos, 547 U.S. 410, 419 (2006); see also Rankin v. McPherson, 483 U.S. 378, 384 (1987) ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.").

To establish a *prima facie* retaliation claim under Section 1983 in violation of a public employee's First Amendment right to freedom of speech, a plaintiff must show that: "(1) his or her speech was constitutionally protected; (2) he or she suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action." Washington v. Cnty. of Rockland, 373 F.3d 310, 320 (2d Cir. 2004). If plaintiff sufficiently alleges these elements, defendants' motion to dismiss should be denied, unless the pleadings indicate either that (1) defendants would have taken the same adverse employment actions even "in the absence of" plaintiff's protected speech, see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), or (2) plaintiff's right to freedom of speech is outweighed by the NYPD's "legitimate purpose in promoting efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service," Connick, 461 U.S. at 150-51 (internal citations and quotation marks omitted); see also Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) (developing balancing approach).

There is no dispute that plaintiff has sufficiently alleged that adverse employment action was taken against him and that a "causal connection exists" between the speech and such action. Likewise, defendants do not contend that the adverse action would have taken place "even in the absence of" the protected speech, or that there was "an adequate justification for treating the employee differently from any other member of the general public."[1] Doyle, 429 U.S. at 287; Garcetti, 547 U.S. at 410. Thus, for purposes of this motion, the only issue that the Court need

---

[1] Even if defendants did argue that plaintiff's First Amendment interests were outweighed by the potential for workplace disruption, their claim would fail as a matter of law, at least at this stage in the proceedings. As the Second Circuit recently explained in a similar context: "[I]f the allegations of internal misconduct are indeed true, [the employee's] statements could not have adversely affected the *proper* functioning of the department since the statements were made for the very reason that the department was not functioning properly." Jackler v. Byrne, 658 F.3d 225, 237 (2d Cir. 2011) (emphasis in original) (internal citations and quotations omitted).

address is whether plaintiff has sufficiently alleged that his complaint to IAB constitutes protected speech under the First Amendment.

In Garcetti v. Ceballos, the Supreme Court sought to clarify the test for protected speech: "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a *citizen* addressing matters of *public concern*." 547 U.S. at 417 (emphasis added). In so holding, the Garcetti court set forth two necessary showings for a public employee claiming First Amendment protection. First, the plaintiff must have spoken "as a citizen," as opposed to as a "public employee." See id. at 417-18. Second, the subject matter of the public employee's speech must have been a matter of "public concern." See id. "The inquiry into the protected status of speech is one of law, not fact" that the Court may resolve at the pleading stage. Connick, 461 U.S. at 148, n.7.

Given the allegations in this case, I readily conclude that plaintiff's complaint to IAB is protected under the First Amendment: Plaintiff did "speak as a citizen addressing matters of public concern." Garcetti, 547 U.S. at 417.

   a.   Plaintiff Spoke as a Citizen

In Garcetti, the Supreme Court stressed that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421 (emphasis added). The facts in Garcetti are fairly straightforward: the plaintiff, a calendar deputy employed by the Los Angeles County District Attorney's office, was retaliated against after writing a "disposition memo," which was a "task[] he was paid to perform," id. at 413, 421-22, and he conceded that he had done so "pursuant to his employment duties," id. at 424. The Court concluded that "speech that owes its existence to a public

employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." Id. at 421-22. The Court did not explicitly reach the issue of whether the speech addressed a matter of "public concern." Id. at 425.

The Second Circuit has since frequently confronted similar situations where, as in Garcetti, the speech at issue was *expressly* part of the employee's official job duties and thus not protected under the First Amendment. See, e.g., Morey v. Somers Cent. Sch. Dist., 410 F. App'x 398, 399 (2d Cir. 2011) (no First Amendment protection where head custodian "responsible for overseeing the general cleaning and upkeep of the school building" discovered asbestos contamination and reported it as part of his duties); Huth v. Haslun, 598 F.3d 70, 74 (2d Cir. 2010) ("We have no difficulty concluding that [plaintiff's] speech was made not as a 'citizen' but, rather, pursuant to [plaintiff's] official duties" where the plaintiff's speech consisted only of "pass[ing] along . . . concerns . . . to the head of [plaintiff]'s division" about employees in her own division.); Healy v. City of New York Dep't of Sanitation, 286 F. App'x 744, 746 (2d Cir. 2008) (holding that it was expressly "within the scope" of Department of Sanitation employee's duties to report to his supervisor corruption discovered while performing a routine inventory check); see also Benvenisti v. City of New York, No. 04 Civ. 3166(JGK), 2006 WL 2777274, at *9 (S.D.N.Y. Sept. 23, 2006) (Koeltl, J.) (holding that plaintiff's complaints to supervisors regarding productivity issues within his unit "involved precisely the sorts of internal office affairs and employment matters that the plaintiff—as a manager and supervisor—had a duty to address.").

Two recent opinions in this Circuit have addressed circumstances where speech concerning official corruption was considered part of the plaintiff's core job duties and consequently was not protected. In Anemone v. Metro. Trans. Auth., 629 F.3d 97, 116 (2d Cir.

2011), the Second Circuit held that communications between former Security Director for the Metropolitan Transportation Authority ("MTA") and the District Attorney's office concerning MTA corruption was not protected speech because reporting corruption "was clearly pursuant to [plaintiff's] official duties" and the plaintiff had "regularly interacted with [DAs] and viewed cooperating with these offices as among his duties." Id. Similarly, in Brady v. Cnty. of Suffolk, 657 F. Supp. 2d 331 (E.D.N.Y. 2009) (Bianco, J.), a case heavily relied upon by defendants, a police officer charged exclusively with enforcing New York State's Vehicle and Traffic Law ("VTL") by issuing traffic citations, complained internally about corruption, specifically that he was instructed not to enforce the VTL against off-duty law enforcement personnel and those with Police Benevolent Association cards. The court denied the plaintiff First Amendment protection, holding that the speech was "more than just *related*" to his employment, but "one of plaintiff's core job functions." Id. at 344 (emphasis in original). That is, "plaintiff's speech related to his daily professional activities, specifically his practice of issuing traffic summonses to certain individuals." Id. at 348 (internal quotation marks omitted).

In Garcetti, however, the Supreme Court also recognized that there would be a second and entirely different species of cases where, unlike the facts presented in Garcetti itself or the Second Circuit cases just described, "there [would be] room for serious debate" over whether the employee was speaking as a citizen or "pursuant to his employment duties." Garcetti, 547 U.S. at 424. The Court offered little guidance other than to emphasize that the inquiry should be "a practical one" that goes beyond mere "[f]ormal job descriptions." Id. In Weintraub v. Bd. of Educ., 593 F.3d 196 (2d Cir. 2010), the leading Second Circuit case interpreting Garcetti, the court added that "speech can be pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by

the employer . . . [where the speech is] part-and-parcel of his concerns about his ability to properly execute his duties." Id. at 203 (internal citations and quotation marks omitted).

Weintraub centered on a union grievance filed by a public school teacher about his school's failure to discipline an unruly student assigned to his class. Id. In holding that the teacher's grievance was "part-and-parcel of his concerns about his ability to properly execute his duties," and thus undertaken "pursuant to his job duties," the court stressed that maintaining classroom discipline was "an indispensable prerequisite to effective teaching and classroom learning" and that the teacher's speech "was a means to fulfill and undertaken in the course of performing his primary employment responsibility of teaching." Id. (internal citations and quotation marks omitted). The court also found relevant the fact that the teacher's form of speech, the employee grievance, had "no relevant citizen analogue." Id. at 203 (citing Garcetti, 547 U.S. at 424).

In applying Garacetti and Weintraub to this second and more nebulous class of cases where no clear "official duty" to speak is present on the record, this Circuit focuses on the subject, manner, and context of the speech to determine whether it relates to topics that are "indispensable prerequisites to effective" performance of the speaker's "primary employment responsibility," and thus not entitled to First Amendment protection.  Weintraub, 593 F.3d at 203. Compare Jackler, 658 F.3d at 240 (extending First Amendment protection for police officer's refusal to speak about misconduct by colleague that "did not implicate [plaintiff's] ability to do his own job properly"); Tucker v. City of New York, No. 07 Civ. 10367(NRB), 2011 WL 2893077, at *6 (S.D.N.Y. July 15, 2011) (Buchwald, J.) (holding city employee's complaints about a colleague's corruption were protected because they did not have "*any bearing on [the employee's] ability to carry out his job* as a [Poison Control Information

Specialist].") (emphasis added); with Carter v. Inc. Vill. of Ocean Beach, 693 F. Supp. 2d. 203, 211 (E.D.N.Y. 2010) (Feuerstein, J.), aff'd, 415 F. App'x 290 (2d Cir. 2011) (finding no First Amendment protection where "[a]ll of plaintiffs' complaints to their superiors . . . related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern . . . [that various acts] *affected their ability to perform their job assignments* safely . . . .") (emphasis added); Kelly v. Huntington Union Free Sch. Dist., No. 09-CV-2101(JFB)(ETB), 2012 WL 1077677, at *13 (E.D.N.Y. Mar. 30, 2012) (Bianco, J.) (rejecting First Amendment retaliation claim where teacher "admit[ted] that she complained to the Assistant Superintendent because she believed that [her supervisor's misconduct] n*egatively affected her ability to give a follow-up lesson* . . . .") (emphasis added); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 353 (S.D.N.Y. 2010) (Rakoff, J.) (holding speech "part-and-parcel" of police officer's duties and not protected where "common theme of all [of plaintiff's] statements was that [his partner] was violating suspects' rights and was not performing his job properly, and by implication that [the partner] *was interfering with [plaintiff]'s ability to perform his own duties*") (emphasis added).

Defendants contend that plaintiff's speech falls within both classes of speech identified in Garcetti. Defendants first argue that plaintiff's reporting to IAB of McCarthy's criminal overture falls within the first class of Garcetti cases, as the "complaints were . . . made pursuant to [plaintiff's] official job duties and therefore not entitled to First Amendment protection." ECF Docket # 31, Defendants' Memorandum in Support of Motion to Dismiss ("Defs.' Mem.") at 19. In support of this contention, defendants cite to Section 207-21 of the NYPD Patrol Guide, which provides, in relevant part: "All members of the service have an absolute duty to report any corruption or serious misconduct, or allegation of corruption or serious misconduct, of which they become aware." ECF Docket # 33, Exhibit B, NYPD Patrol Guide Section 207-21, annexed

to the Declaration of Andrea O'Connor, dated January 19, 2011 ("Patrol Guide").[2] The Patrol Guide indicates that any reports may be directed to IAB via a 24-hour call center. Id.

I am not at all persuaded that the existence of this manual, described merely as "Training Materials," forecloses plaintiff's claim to First Amendment protection. Garcetti itself "reject[ed] . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." Garcetti, 547 U.S. at 424. If the Court were to accept defendants' expansive theory of the "official duties" of police officers based upon the mere existence of Section 207-21, irrespective of its compulsory language, it "would effectively curtail all [NYPD officers'] right[] to speak out about corruption, thereby discouraging whistleblower activity that is of great benefit to civil society." Tucker, 2011 WL 2893077 at *6, n.4 (rejecting argument that applicable city-wide policy, which "affirmatively obligates all city employees to report corruption, criminal activity, or conflicts of interest . . . establishes [the employee's] official duty . . . and thus deprives . . . First Amendment protection for whistleblowing.").

Moreover, defendants' argument ignores the relevant allegation that reporting internal misconduct to IAB was neither encouraged nor rewarded. Much the opposite, the complaint alleges that the NYPD actively and aggressively opposed whistleblowing. See, e.g., Paola v. Spada, 498 F. Supp. 2d 502, 508 (D. Conn. 2007), on remand, 204 F. App'x 946 (2d Cir. 2006) (holding that relevant inquiry is "whether the written rules or job duties differ from actual performance of the job as condoned by the employer or from employer expectations of job duties"). Thus the fact that plaintiff's reporting may have been *required* by some broader written policy applicable to all police officers has no bearing on whether such reporting was actually

---

[2] The Court may consider the NYPD Patrol Guide in deciding this motion, because "[i]t is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998).

expected or permitted, much less tolerated, *in practice*. See Garcetti, 547 U.S. at 424-25

("Formal job descriptions often bear little resemblance to the duties an employee *actually*

*is expected* to perform, and the listing of a given task in an employee's written job description is

neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the

employee's professional duties for First Amendment purposes.") (emphasis added).

This case is readily distinguishable from Barclay v. Michalsky, 368 F. App'x 266 (2d Cir.

2010) and Paola v. Spada, 372 F. App'x 143 (2d Cir. 2010), in which the Second Circuit held

speech to be unprotected where plaintiffs in both cases reported wrongdoing pursuant to broadly

applicable work rules and/or employee manuals requiring reporting of internal corruption or

misconduct.[3]  In both cases, plaintiffs were *specifically directed by their superiors* to report the

wrongdoing consistent with the duties specified in their respective policy manuals.[4]  Barclay,

368 F. App'x at 268; Paola, 372 F. App'x at 144.

In the alternative, defendants contend that plaintiff's speech falls within the second

species of cases identified in Garcetti, arguing in conclusory fashion: "[I]t certainly cannot be

said that reporting alleged misconduct is not 'part-and-parcel' of a detective's job function."

Defs.' Mem. at 10 (citing Weintraub, 593 F.3d at 203). Yet surely the Second Circuit would not

have denied the teacher in Weintraub First Amendment protection for complaining about another

---

[3] This case is also readily distinguishable from D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 354 (S.D.N.Y. 2010)
(Rakoff, J.), which held that a police officer complaint outside the chain-of-command to the Inspector General was
"unprotected by the First Amendment because these statements *were required by law*," namely New York Labor
Law Section 27-b and Executive Law Section 55. Id. (emphasis added). By contrast, the NYPD Patrol Guide is a
"training manual," intended only to "provide additional guidance on the most common practices of the Department,
and serve as performance expectations." NYPD Patrol Guide § 200-01. Section 207-21 is not "law."

[4] Note that the Second Circuit's Summary Order in Paola affirmed and relied upon an unpublished "Ruling on
Motion for Reconsideration" by the District Court. This unpublished opinion included the discussion of the
superior's explicit order, upon which the decision relied. See Paola, 372 F. App'x at 143, n.1 (citing Paola v. Spada,
No. 03-CV-1628 (D. Conn. Dec. 7, 2007)).

teacher's molestation of a student. Here too, although official misconduct in the police department should of necessity be a *concern* of every police officer, the complaint provides no indication that plaintiff's reporting of McCarthy's alleged misconduct was an "indispensable prerequisite[] to effective" performance of plaintiff's "primary employment responsibility" of investigating crimes. Defendants' argument would create an impermissibly broad definition of a public employee's job responsibilities. See Ricciuti v. Gyzenis, 832 F. Supp. 2d 147, 157 (D. Conn. 2011) ("Were 'part-and-parcel' to encompass all speech that aims to improve a government employee's workplace—thereby helping the employee carry out her core duties there—everything that employees say relating to their work would end up falling outside the First Amendment's protections.") Plaintiff's job was to police the public, not other officers. Cf. Matthews v. Lynch, No. 11-1734-cv, 2012 WL 1873657, at *1-2 (2d Cir. May 24, 2012) (finding report of police corruption by member of Connecticut State Police Internal Affairs' not protected by First Amendment because plaintiff was specifically tasked with *investigating the misconduct of fellow officers*). Furthermore, McCarthy was not plaintiff's partner and neither officer was assigned to the case in which the victim interview was botched. In short, McCarthy's alleged misconduct did not directly interfere with plaintiff's ability to perform his assigned duties as a police officer.

That avoiding undeserved blame for the botched investigation may have motivated plaintiff, in part, to report McCarthy does not alter the Court's analysis. Garcetti made clear that whether an employee's speech "concerned the subject matter of [the speaker's] employment [is] . . . nondispositive." 547 U.S. at 421; see also Freitag v. Ayers, 468 F.3d 528, 545 (9th Cir. 2006) ("[An employee] does not lose her right to speak as a citizen simply because . . . the communications . . . concerned the subject matter of her employment."); Tucker, 2011 WL

2893077, at *6 ("[A]lthough [the employee] may have been motivated in part by other frustrations at work, [the employee] made his statements to investigators as a private citizen . . . .").

Defendants further argue that plaintiff's speech is unprotected because reporting to IU and IAB falls within plaintiff's "chain of command" since "plaintiff directed his alleged speech *only* to NYPD officials." Defs.' Mem. at 10-11 (emphasis in original) (internal quotation marks omitted). As an initial matter, all cases defendants cite in support of this claim, with the exception of Weintraub, involve circumstances where the speaker *only* complained internally, to a supervisor. See Defs.' Mem. at 11 (citing Brady, 657 F. Supp. 2d at 344 (complaints made by police officer *only to his supervisors*); Healy, 286 F. App'x at 746 (report of corruption made *only to superior*); Caracillo v. Vill. of Seneca Falls, 582 F. Supp. 2d 390, 410-11 (W.D.N.Y. 2008) (all speech found to be unprotected was directed solely to *superiors*)). While reporting to IU may be considered synonymous with internally reporting to superiors, reporting to IAB is an entirely different story: plaintiff's complaint to IAB cannot be considered as part of "the chain of command" at the NYPD. Defs.' Mem. at 11 (internal quotation marks omitted). Although technically under the umbrella of the NYPD, the IAB is "the body . . . in a position to take action based on the allegations." Ross v. Lichtenfeld, 755 F. Supp. 2d 467, 474 (S.D.N.Y. 2010) (Young, J.) (holding that employee spoke as citizen when she made allegations of fraud and theft in school district to *same school district's* board). That plaintiff first reported McCarthy's alleged misconduct to IU, before reaching out to IAB, is of no consequence. Garcetti, 547 U.S. at 420 ("That [plaintiff] expressed his views inside his office, rather than publicly, is not dispositive."). That plaintiff reported the misconduct to both outlets only reinforces this distinction. See Carter, 693 F. Supp. 2d. at 211 ("If . . . a public employee takes his job concerns to persons outside the

work place *in addition to raising them up the chain of command at his workplace*, then those external communications are ordinarily not made as an employee, but as a citizen.") (emphasis added) (internal citations and quotation marks omitted).

Moreover, *any* citizen may report wrongdoing to the IAB. Citizens are able and directed to file reports with the IAB in the exact same manner as NYPD officers and using the exact same 24-hour phone number provided to NYPD officers in their Patrol Guide. The IAB phone number is located prominently on the public web page of the New York City Commission to Combat Police Corruption, an independent "board to monitor and evaluate the anti-corruption programs, activities, commitment, and efforts of the [NYPD]."[5] Somewhat surprisingly, defendants counter that it is "speculative . . . that a civilian member of the general public would contact IAB to report alleged police misconduct."[6] Defs.' Reply at 2. Yet even accepting this improbable assumption, it is the channel's *availability* to citizens, as opposed to its actual *use* that is constitutionally significant. See Weintraub, 593 F.3d at 204 (asking whether plaintiff "voic[ed] his grievance through channels *available* to citizens generally") (emphasis added); Freitag, 468 F.3d at 545 ("[Plaintiff's] *right to complain* both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee.") (emphasis added); Dingle v. City of New York, No. 10 Civ.

---

[5] Commission to Combat Police Corruption Homepage, http://www.nyc.gov/html/ccpc/html/home/home.shtml (last visited June 1, 2012); see also supra note 3.

[6] Defendants also suggest that plaintiff could have instead "lodge[d] a complaint with the New York City Civilian Complaint Review Board ("CCRB")," Defs.' Mem. at 10, but plaintiff correctly points out that the CCRB only "investigates complaints of excessive or unnecessary use of force, abuse of authority, discourtesy, and offensive language" and "refers complaints about corruption or neglect of duty to the NYPD," Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 10-11; see Frequently Asked Questions, New York City Civilian Complaint Review Board, http://www.nyc.gov/html/ccrb/html/faq.html (last visited June 1, 2012); see also supra note 3. Defendants further point out that plaintiff could have gone directly to the District Attorney's office to press criminal charges against McCarthy, Defs.' Mem at 10, but such action may—conveniently (for defendants)—have deprived plaintiff's speech of First Amendment protection for being unduly disruptive, see, e.g., Connick, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

4(SAS), 2011 WL 2682110, at *6 (S.D.N.Y. July 7, 2011) (Scheindlin, J.) (extending First Amendment protection where public official complained to "precisely" the same "administrative agencies . . . where a private citizen . . . would report").

In one last effort to persuade the Court that plaintiff's speech had no "relevant citizen analogue" and thus was made pursuant to his role as a public employee, defendants assert for the first time in their Reply Brief: "There are no allegations that a member of the general public would have knowledge of Detective McCarthy's alleged misconduct." Defs.' Reply at 3. This, however, is exactly the point. Such speech must necessarily be protected by the First Amendment to protect the public's significant First Amendment interest in receiving information about the functioning of government, to which they otherwise would not be privy. "Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." City of San Diego v. Roe, 543 U.S. 77, 82 (2004) (per curiam); see also Garcetti, 547 U.S. at 419 (acknowledging that "First Amendment interests . . . extend beyond the individual speaker" and recognizing "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion"); Pickering, 391 U.S. at 572 ("Teachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.").

While Garcetti does indeed invite "multiple interpretations," Weintraub, 593 F.3d at 205 (Calabresi, J., dissenting), it cannot be used to shield those who flagrantly and repeatedly violate

their oath of office. Some applications of <u>Garcetti</u> may be troublesome. This is not such a case. Accordingly, I find that plaintiff has sufficiently pled that he spoke as a citizen. I now discuss why the subject of plaintiff's speech indisputably related to a matter of "public concern."

    b.   Plaintiff's Speech Concerned a Matter of Public Concern

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." <u>Lewis v. Cowen</u>, 165 F.3d 154, 163 (2d Cir. 1999). Speech relates to a public concern when it can "be fairly considered as relating to *any matter* of political, social, or other concern to the community." <u>See</u> <u>Connick</u>, 461 U.S. at 146 (emphasis added). As the Second Circuit recently affirmed in the context of a police officer's internal reports of alleged misconduct, the speech need not be aired publicly to address a matter of public concern. "The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern." <u>Jackler</u>, 658 F.3d at 235; <u>see</u> <u>also</u> <u>Rankin</u>, 483 U.S. at 387 (considering single private statement to coworker regarding Presidential assassination attempt to have "plainly dealt with a matter of public concern"); <u>Givhan v. Western Line Consol. Sch. Dist.</u>, 439 U.S. 410, 414 (1979) (rejecting "conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly."); <u>Ezekwo v. NYC Health & Hosps. Corp.</u>, 940 F.2d 775, 781 (2d Cir. 1991) (holding that employee's decision to privately discuss her concerns with her employer rather than expressing her views publicly does not alter analysis).

Speech relating to the functioning of government is of particularly great import to the public. As Justice Brennan observed, "It is hornbook law . . . that speech about the manner in which government is operated or should be operated is an essential part of the communications

necessary for self-governance the protection of which was a central purpose of the First Amendment." Connick, 461 U.S. at 156 (Brennan, J., dissenting) (internal citations and quotation marks omitted). Within this broader category lies an even more compelling subcategory: "Exposing governmental inefficiency and misconduct is a matter of considerable significance." Garcetti, 547 U.S. at 425; see also Hoyt v. Andreucci, 433 F.3d 320, 330 (2d Cir. 2006) ("We view concerns raised to the government about the lawfulness of public officials' actions as implicating a matter of public interest . . . ."); Anemone v. Metro. Transp. Auth., 410 F. Supp. 2d 255, 265 (S.D.N.Y. 2006) (Mukasey, J.) ("Speech relating to public corruption and/or a public entity's failure to adequately or properly investigate such corruption lies comfortably within the[] categories of protected expression.") (citing Vasbinder v. Ambach, 926 F.2d 1333, 1340-41 (2d Cir. 1991)). Of greatest significance, however, is speech related to corruption in the police force. See Jackler, 658 F.3d at 236 ("Exposure of official misconduct, *especially* within the police department, is generally of great consequence to the public.") (emphasis added) (internal citations and quotation marks omitted); Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006) ("Plaintiffs' speech plainly concerned issues of public concern: misfeasance within the police department and allegations of an ongoing cover-up and an attempt to silence those who spoke out against it.").

Defendants raise two challenges to plaintiff's claim that his reports to IAB addressed a matter of public concern, both of which lack merit.

First, ignoring readily available inferences that a fact-finder might draw from the facts as plead, defendants argue that plaintiff's complaint is "devoid of any allegations that there is an epidemic within the NYPD regarding members of service being 'instructed' to lie during official investigations." Defs.' Mem. at 13. It is constitutionally irrelevant, however, that plaintiff's

report concerned a single incident of alleged corruption in the police force, as opposed to an "epidemic." <u>See</u> <u>Nagle v. Marron</u>, 663 F.3d 100, 108 (2d Cir. 2011) (suggesting that "particularly important instance of bad judgment . . . might [be] . . . elevated . . . to a matter of public concern"); <u>Cioffi III v. Averill Park Cent. Sch. Dist. Bd. of Educ.</u>, 444 F.3d 158, 164 (2d Cir. 2006) (finding speech primarily stemming from single sexual assault of student on school property was of "paramount interest" and "obvious concern to the public."); <u>Lewis</u>, 165 F.3d 154 (finding that chief of state lottery unit spoke on matter of public concern based on single refusal to follow order to positively characterize proposed changes to state Gaming Policy Board).

Recently confronted with remarkably similar facts to the case *sub judice*, the Second Circuit held that a plaintiff pled a viable First Amendment retaliation claim based upon a single incident of alleged corruption where a plaintiff's fellow police officers requested that he withdraw his report and cover up a colleague's excessive use of force. <u>See</u> <u>Jackler</u>, 658 F.3d at 234. <u>De Los Santos v. City of New York</u>, 482 F. Supp. 2d 346 (S.D.N.Y. 2007), the only case defendants cite to support their urged single-incident-versus-epidemic distinction, is unavailing. In <u>De Los Santos</u>, the plaintiff complained internally about two police officers having consensual sex. In holding that the plaintiff's speech did not address an issue of public concern, the court noted that the plaintiff's complaints, based upon "a single event in the workplace, are devoid of *any social commentary*, and do not suggest an epidemic problem *that might impact the public or warrant its concern*." 482 F. Supp. 2d at 353-54 (emphasis added). The present matter is *far* different: A police officer allegedly rallying his colleagues to lie in the course of an internal probe into a botched murder investigation and then threatening a fellow officer to accept fault for something he did not do is of paramount public concern, raising at the very least, the specter of more widespread corruption. <u>See, e.g.,</u> <u>Cahill v. O'Donnell</u>, 7 F. Supp. 2d 341, 349 (S.D.N.Y.

1998) (Parker, J.) (holding that "[t]he *possibility* of widespread police corruption," predicated on two isolated incidents of alleged corruption and excessive use of force, was "a matter of political and social concern" where incidents "addressed instances of purported police misconduct in which civilians *were or could have been harmed*") (emphasis added).

Second, defendants argue that plaintiff's complaint to IAB was "of a personal nature and therefore not a matter of public concern," Defs.' Mem. at 12, motivated primarily by plaintiff's personal grudge against McCarthy and workplace conditions. However, "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." Sousa v. Roque, 578 F.3d 164, 173 (2d Cir. 2009). To the contrary, "the primary question for First Amendment purposes is whether the matter is of public concern, *not* whether the speech was also made to serve some private interest." Nagle, 663 F.3d at 107 (emphasis added); see also Ricciuti, 832 F. Supp. 2d at 154 ("[Plaintiff's] speech cannot be categorized as personal simply because it was connected to, arose from, or even was motivated by [plaintiff's] many grievances with conditions at [work]."). Even assuming that plaintiff spoke, in part, because he was concerned with the threat of being disciplined unjustly, or alternatively, disciplined out of spite, "the mere fact that [he] took a personal interest in the subject matter of the speech does not remove [the speech] from the protection of the First Amendment, nor should it." Johnson v. Ganim, 342 F.3d 105, 114 (2d Cir. 2003) (internal citations omitted).

Accordingly, accepting plaintiff's allegations as true, all of which are plausible, I find that plaintiff's speech plainly addressed a matter of public concern.

c. Qualified Immunity

The individual defendants raise the affirmative defense of qualified immunity, which shields government officials from liability in their performance of discretionary functions if

"their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Where, as here, a plaintiff has already sufficiently alleged a constitutional violation at the hands of the government officials claiming immunity, defendants will only be shielded if it was objectively reasonable for the officials to believe their actions were not unlawful in light of "clearly established" law. Nagle, 663 F.3d at 114 (internal quotation marks omitted).

Although a qualified immunity defense can be presented in a Rule 12(b)(6) motion, "the defense faces a formidable hurdle" at this stage in the proceedings. McKenna v. Wright, 386 F.3d 432, 434 (2d Cir. 2004). "Not only must the facts supporting the defense appear on the face of the complaint, but . . . the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Id. at 436 (internal citations and quotation marks omitted). Furthermore, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." Id. Because of this heightened standard, dismissal of the claims against the individually named defendants on qualified immunity grounds is inappropriate.

Defendants' lone argument in favor of qualified immunity is that "lodging a complaint about a fellow member of service is certainly not a 'clearly established' First Amendment right such that it 'would be clear' to the Individual Defendants [sic] that their 'conduct was unlawful.'" Defs.' Mem. at 25. As the Second Circuit recently cautioned, however, the "clearly established law" "standard must not be so specific that qualified immunity could be overcome only if the *very action in question* has previously been held unlawful." Nagle, 663 F.3d at 114 (emphasis added) (internal citations and quotation marks omitted). Plaintiff's claims are not

foreclosed by the lack of precedent involving the particular type of speech at issue here. Appropriately broadening the scope of the inquiry, therefore, by December 2005, when the retaliation is alleged to have begun, it had already long been "clearly established that the First Amendment protected . . . a government employee, including a police officer, speaking as a citizen on a matter of public concern, against retaliation for that speech . . . ." Jackler, 658 F.3d at 243 (citing relevant Supreme Court and Second Circuit cases decided between 1968 and January 2006).

Although not in dispute, defendants have also failed to meet their burden to show that their actions were objectively reasonable. As already discussed, plaintiff has sufficiently alleged retaliatory animus, let alone the far lesser standard of unreasonableness. "Though the qualified immunity inquiry is generally an objective one, a defendant's subjective intent is indeed relevant in motive-based constitutional torts such as [First Amendment employment retaliation]." Johnson, 342 F.3d at 117; see also Sheppard v. Beerman, 94 F.3d 823, 828 (2d Cir. 1996) (holding that even at summary judgment stage, the qualified immunity standard "stops short of insulating an official whose objectively reasonable acts are besmirched by prohibited unconstitutional motive").

For all of the foregoing reasons, defendants' motion to dismiss the First Amendment retaliation claim is denied.

### 3. Procedural and Substantive Due Process

Plaintiff additionally sues for violations of his procedural and substantive due process rights under the Fifth and Fourteenth Amendments. It is well-established that "the Fifth Amendment appl[ies] to and restrict[s] only the Federal Government." Pub. Utils. Comm'n of

Dist. of Columbia v. Pollak, 343 U.S. 451, 461 (1952). Because the federal government is not a defendant in this action, plaintiff's Fifth Amendment claims are hereby dismissed.

Plaintiff alleges that his constructive termination at the hands of defendants deprived him of a property interest in his employment without adequate process. Compl. ¶¶ 77-78, 80. Even assuming that plaintiff had a "legitimate property interest" in his job and was constructively terminated, however, I must dismiss his procedural due process claims as a matter of law because "the availability of an Article 78 proceeding provided [plaintiff] with a meaningful opportunity to challenge the voluntariness of his resignation sufficient to ensure due process." Stenson v. Kerlikowske, 205 F.3d 1324, 1324 (2d Cir. 2000) (finding that "coerced resignation" was "sufficiently unforeseeable" to justify a post-deprivation hearing) (internal citations and quotation marks omitted); see also Giglio v. Dunn, 732 F.2d 1133, 1134 (2d Cir. 1984) ("Assuming, as appellant alleges, that his resignation was coerced, Article 78 . . . made available to [plaintiff] both a hearing and a means of redress."); Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880-81 (2d Cir. 1996) ("We have held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy" where the loss of employment was the result of a "random, arbitrary act by a state employee."). The *availability* of an Article 78 proceeding precludes plaintiff's procedural due process claim. Id. at 881.

Plaintiff additionally alleges that defendants deprived him of substantive due process because he was stigmatized in conjunction with the deprivation of his government employment. Compl. ¶ 81. Referred to as "stigma-plus," this claim "involves an injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus), without adequate process." Segal v. City of New York, 459 F.3d 207, 212 (2d Cir. 2006)

(internal citations and quotation marks omitted). To make out "stigma-plus," defamatory statements must be made public and must be made in close temporal proximity to a plaintiff's dismissal from government employment. Id. Although technically falling within the realm of *substantive* due process, see Bishop v. Wood, 426 U.S. 341, 348-49 (1976); Velez v. Levy, 401 F.3d 75, 93-94 (2d Cir. 2005), the stigma-plus claim is considered "a species within the phylum of *procedural* due process claims," and thus, like any procedural due process claim, "enforces a limited but important right: the right to be heard 'at a meaningful time and in a meaningful manner.'" Id. at 213 (quoting Goldberg v. Kelly, 397 U.S. 254, 267 (1970)) (emphasis added).

Here too, plaintiff's claim must be dismissed because of the availability of an Article 78 proceeding. Anemone, 629 F.3d at 121 (holding that "an Article 78 proceeding provides the requisite post-deprivation process" for stigma-plus claims). Although there is some indication that the adequacy of an Article 78 proceeding for "stigma-plus" claims is limited to "at-will" employment, see Segal, 459 F.3d at 218 ("[W]e hold that, in the context of an *at-will* government employee, a reasonably prompt, post-termination name-clearing hearing satisfies constitutional due process . . . .") (emphasis added), plaintiff's substantive due process claim still fails as a matter of law. The thrust of plaintiff's substantive due process claim is that the stigmatizing accusations against him both led to his constructive termination and were "disseminated widely enough to damage [his] standing in the community . . . ." Brandt v. Bd. of Coop. Educ. Servs., 820 F.2d 41, 44 (2d Cir. 1987). However, these precise bases necessary to make out a substantive due process violation, if proven, "constitute, in themselves, specific constitutional violations" of the First Amendment right to freedom of speech, which I have already held survive defendants' motion to dismiss. Velez, 401 F.3d at 94. As the Second Circuit has cautioned: "[W]here a specific constitutional provision prohibits government action, plaintiffs

seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process." Id. (affirming motion to dismiss because "plaintiff's substantive due process claim is . . . subsumed in her more particularized allegations").

Plaintiff's substantive and procedural due process claims are, therefore, dismissed.

C. Section 1985 Conspiracy Claims

Plaintiff brings Section 1985 claims alleging that defendants "conspired" to deprive him of his constitutional rights. Compl. ¶¶ 84-89. To make out a claim under Section 1985, plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007). Importantly, the "conspiracy must . . . be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action."[7] Id.

Plaintiff has neither pled nor suggested the possible existence of *any* kind of "discriminatory animus," race-based or otherwise, on the part of defendants. Defendants' motion to dismiss plaintiff's Section 1985 claim is, therefore, granted.

---

[7] The "discriminatory animus" component derives from the second element of the Section 1985 claim. United Bhd. of Carpenters & Joiners of Am. v. Scott, 463 U.S. 825, 829 (1983) ("[T]he conspiracy not only must have as its purpose the deprivation of 'equal protection of the laws, or of equal privileges and immunities under the laws,' but also must be motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'") (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).

D. State Law Claims – New York Civil Service Law Section 75-b and Intentional Infliction of Emotional Distress

Lastly, plaintiff brings pendent state law claims against defendants pursuant to Section 75-b of the New York Civil Service Law for whistleblower retaliation and state tort law for intentional infliction of emotional distress. Defendants move to dismiss both claims for plaintiff's failure to file a notice of claim within 90 days as required under sections 50-e and 50-I of the New York General Municipal Law. Defs.' Mem. at 22-23 (citing N.Y. Gen. Mun. Law § 50-e(1)(a) (McKinney 2010) ("In any case founded upon tort where a notice of claim is required by law . . . the notice of claim shall . . . be served . . . within ninety days after the claim arises."); N.Y. Gen. Mun. Law §50-i(1) (McKinney 2009) (requiring that a notice of claim shall be served in compliance with Section 50-e when suing a municipality and/or its employees)). "In federal court, state notice-of-claim statutes apply to state-law claims," <u>Parise v. New York City Dep't of Sanitation</u>, 306 F. App'x 695, 697 (2d Cir. 2009) (citing <u>Felder v. Casey</u>, 487 U.S. 131, 151 (1988)), and applying New York State law on outcome-determinative issues, a federal court must defer to the "ultimate New York authority on the issue." <u>Sphere Drake Ins. Co. v. P.B.L. Entm't, Inc.</u>, 30 F.3d 21, 22 (2d Cir. 1994), <u>withdrawn and vacated on other grounds</u>, 52 F.3d 22 (2d Cir. 1995). "In the absence of a Court of Appeals decision squarely on point . . . the holdings of the Appellate Division . . . are entitled to persuasive, if not decisive, consideration." <u>Id.</u> at 22-23 (internal citations and quotation marks omitted).

Plaintiff concedes that no notice of claim was filed for either state law claim, let alone within 90 days after the claim arose. Instead, plaintiff insists that neither of his state law claims fall within the notice of claims requirements because they "arise from statute" and not from tort. ECF Docket # 34, Plaintiff's Memorandum in Opposition to Motion to Dismiss ("Pl.'s Mem.") at 21-22.

First, plaintiff's claim that intentional infliction of emotional distress is not a tort is baseless and requires no further discussion. Second, plaintiff's claim brought pursuant to section 75-b of the New York Civil Service Law also falls under section 50-e's notice of claim provisions. See Thomas v. City of Oneonta, 934 N.Y.S.2d 249 (N.Y. App. Div. 2011) ("In order to maintain this action [pursuant to section 75-b of the New York Civil Service Law], plaintiff was required to serve a notice of claim upon defendant within 90 days after his underlying claims arose."); Donas v. City of New York, 878 N.Y.S.2d 360, 360 (N.Y. App. Div. 2009) (same). The motion to dismiss plaintiff's pendent state law claims is, therefore, granted.


## IV. CONCLUSION

It remains to be seen whether the evidence will support plaintiff's very serious allegations. It is, however, clear to the Court that the principles supporting limited First Amendment protection to public employees counsel in favor of allowing this case to proceed to discovery. Plaintiff's principle complaint does not simply reflect some intramural tiff over case responsibility or relatively petty administrative gripe or employee grievance. If plaintiff's allegations are sustained, moreover, plaintiff's speech would be of paramount public concern as the integrity of those sworn to protect us would seriously be called into question.

Defendants' motion to dismiss plaintiff's First Amendment retaliation claim pursuant to Section 1983 is denied as to all individually named defendants and the City of New York. Defendants' motion to dismiss plaintiff's procedural and substantive due process claims pursuant to Section 1983 is granted. Defendants' motion to dismiss plaintiff's Section 1985 conspiracy claim is granted. Defendants' motion to dismiss plaintiff's pendent state law claims for

intentional infliction of emotional distress and violation of New York Civil Service Law Section

75-b is granted. All claims filed against the NYPD are dismissed.

SO ORDERED.


Dated: Brooklyn, New York
      July 31, 2012

                                      s/ Judge Raymond J. Dearie
                                    _____
                                    RAYMOND J. DEARIE
                                    United States District Judge